387 S.E.2d 809

**William M. WILSON and
O. Glenn Lockhart**

v.

**R. Dennis XANDER; Alamco, Inc., a Delaware Corporation; Anthony Joseph Lacotti, Jr.; Lisa Lacotti; Willie Eugene Coffey and Gertraud Coffey; and NRM Petroleum Corp. (Natural Resource Management Corp.).**

No. 18954.

Supreme Court of Appeals of
West Virginia.

Dec. 14, 1989.

William W. Talbott, Webster Springs, for William M. Wilson and O. Glenn Lockhart.

Terry D. Reed, Hymes & Coonts, Buckhannon, for Xander & Nat. Resources Management Corp.

Marc A. Monteleone, Thomas E. Scarr, Kevin K. Distler, Charleston.

Richard W. Cardot, Elkins, for W.E. Coffey & G. Coffey.

Harold J. Tulley, Bel Air, Md., for A.J. Lacotti, Jr. & L. Lacotti.

James M. Wilson, Richard M. Yurko, Jr., Clarksburg, for Alamco, Inc.

Richard W. Hosking, Pittsburg, Pa.,

Richard H. Talbott, Jr., Elkins.

NEELY, Justice:

The plaintiffs in this dispute over an oil and gas lease appeal the entry of summary judgment against them in the Circuit Court of Randolph County.

On 1 July 1980, the plaintiffs, William Wilson and Glenn Lockhart (lessees), entered into an oil and gas lease with Anthony and Lisa LaCotti and William and Gertraud Coffey (lessors), covering 105 acres near Cassity in Randolph County. At that time, the lessors had been leasing the coal rights in the land to Mr. Wilson since 1976, but no coal had been mined. The lease was to remain in force for a primary term of three years, and for as long thereafter as oil and gas operations were conducted on the property (including exploration, production, and underground storage). The lessees also promised either to begin oil and gas operations or to make delay rental payments of $315 per year until they did so. The lease specifically allowed for the lessees to assign their interest to another. The lessors warranted title to the property and promised to defend title if necessary. The plaintiffs did not begin oil and gas operations on the property, but sought to assign the lease to someone who would.

Dennis Xander was a regional land manager for the Natural Resource Management Corporation, also doing business as NRM Petroleum Corporation. NRM's business is to acquire oil and gas leases, contract out the actual drilling operations, and sell the gas themselves. As a land manager, Mr. Xander's specialty was finding land with oil and gas and securing good title to the leasable land through assignments of outstanding interests and other negotiations. Some years before, NRM had drilled on land that, through a surveying mistake, was partly owned by the Alleghany Land and Minerals Co., also doing business as ALAMCO. To settle that dispute, ALAMCO and NRM had agreed that NRM would make good by locating two wells and allowing ALAMCO to drill them. It was Mr. Xander's job as a land manager for NRM to secure these leases that would be offered to ALAMCO.

Mr. Xander learned that the Cassity property was under lease to Mr. Wilson and Mr. Lockhart. The property looked promising for NRM to make good to ALAMCO for its previous "debt" of two wells. Mr. Xander began inquiries on his own into the title to the property. In November 1981, Mr. Xander met Mr. Wilson and they discussed assigning the lease to Mr. Xander, but did not agree to do so at that time. Before there was an actual assignment, Mr. Xander pointed out the title defects in the property—many descendants of prior owners retained tiny fractional shares in the property. Mr. Wilson urged Mr. Xander to go ahead and clear up the title by acquiring these small outstanding interests in his, Xanders's, own name. On 29 October 1982, the lessees formally assigned their interest in the property to Mr. Xander for a six-month term. The assignment was without warranties and required Mr. Xander to begin drilling two wells within six months. The lessees retained an undivided 1/32nd of 7/8ths interest in any proceeds from oil and gas drilled during the term of the underlying lease to them from the LaCottis and the Coffeys.

Through and beyond the end of his assignment on 29 April 1983, Mr. Xander continued his efforts to clear title to the land and prepare for drilling. This he did not complete before the end of the primary term of the underlying lease, 1 July 1983, and drilling did not begin before that date. Some drilling permits were obtained by that time, however. Before 1 July 1983, the lessors continued to receive delay rental payments on the Cassity property. None was tendered on that account after that date.

In 1983, Mr. Wilson, Mr. Lockhart, and Mr. Xander asked the Coffeys and the LaCottis to extend the 1980 lease. The lessors refused. On 4 July 1983, the lessors wrote to the lessees that they considered the 1980 lease to have expired by its terms on 1 July 1983. The Coffeys and LaCottis then entered a new lease on 18 July 1983 with Mr. Xander, lessee, "as trustee" (presumably for NRM, ALAMCO, or both). On 22 October 1983, Mr. Xander assigned his interest in the new lease, "as trustee for ALAMCO," to ALAMCO. During the new lease, preparations were finally complete and ALAMCO began drilling. Oil and gas were produced in paying quantities.

On 28 December 1984, the plaintiffs Mr. Wilson and Mr. Lockhart, the original lessees, began this action in the Circuit Court of Randolph County. Various cross-claims were filed among the defendants. Extensive discovery was had, but was not completed when the defendants began to step forward and move for summary judgment in their favor. These motions the court granted, ruling that the plaintiffs' 1980 lease expired by its own terms because of their failure to begin drilling before 1 July 1983, and there was no valid ground in law for extending the lease or granting the plaintiffs relief based on the parties' dealings over the disputed property.

The essence of the complaint is that the defendants destroyed the value of the plaintiffs' leasehold by not delivering them clear title to the property (as warranted in the lease) and, by other foot-dragging and conspiracy, ensured that production of oil and gas on the property would have to wait until the primary term of the plaintiffs' lease had expired and the property could be let to Mr. Xander and ALAMCO. The defendants thus prevented the plaintiffs from continuing the lease beyond its primary term and thus, the claim is made, deprived the plaintiffs of profit from the oil and gas on the property that was eventually produced. The defendants' actions, the plaintiffs argue, should estop the defendants from denying that the plaintiffs' lease of the property continued in force beyond 1 July 1983, the end of the primary term.

The standard for granting summary judgment is a high one:

> The judgment sought shall be rendered ... if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Rule 56(c), W.Va.R.C.P. [1978]. As this Court has stated, it is "precipitous" for the trial judge to grant a motion for summary judgment before the completion of discovery. *Bd. of Education v. Van Buren & Firestone, Architects,* 165 W.Va. 140, 267 S.E.2d 440 (1980). That learning is plain in a case like this one, where the plaintiffs suspect some shenanigans on the other side and must rely on discovery to reveal whether they have a case at all and, if so, how they might prove it.

In West Virginia, an oil and gas lease for a primary term or for so long as oil and gas are being produced is treated as a determinable estate, that is, subject to a special limitation. Syl.Pt. 2, *McCullough Oil, Inc. v. Rezek,* 176 W.Va. 638, 346 S.E.2d 788 (1986). When the *habendum* clause in an oil and gas lease requires drilling or production within the primary term for the lessee to avoid forfeiture and termination of the lease, the courts will normally honor the letter of the lease. *Id.;* see also *W.Va.Code,* 36–4–9a [1979]. In rare cases, however, the lessor may himself hinder the lessee's performance, precipitating the special limitation and defeasance of the lessee's estate. Such hindrance gives the lessee a continuing legal excuse for not performing. See *Fey v. A.A. Oil Co.,* 129 Mont. 300, 285 P.2d 578 (1955). In such cases, the doctrine of equitable estoppel effectively extends the lease for the reasonable time that justice may require for the lessee to begin production unhindered and avoid the special limitation. *Ohio Fuel Oil Co. v. Greenleaf,* 84 W.Va. 67, 99 S.E. 274 (1919); see also *Violette v. Gaertner,* 261 Mich. 6, 245 N.W. 554 (1932) and *Continental Oil Co. v. Osage Oil & Refining Co.,* 69 F.2d 19 (10th Cir.1934); see gener-

ally R. Hemingway, *The Law of Oil and Gas* § 6.4, at 303 (2d ed.1983).

 To invoke estoppel, the lessee must use due diligence toward production, and the plaintiffs may well be criticized in this case for waiting two years of a three-year lease before attempting to clear the title and obtain drilling permits. But it is significant in this case that the lessors warranted title to the property, which they did not in fact have. Such a warranty might well justify reliance by the lessees and explain their slowness off the mark in clearing the title to the property. The lessees' degree of diligence is a factual question, however, and not in this case susceptible of summary judgment.

Because there are genuine issues of fact in the case, and the defendants were not entitled to judgment as a matter of law, entry of summary judgment against the plaintiffs was improper. The judgment of the circuit court is therefore reversed and the case remanded for further proceedings consistent with this opinion.

Reversed and Remanded.