446 S.E.2d 494

**JOLYNNE CORPORATION, Plaintiff Below, Appellant,**

v.

**Donald G. MICHELS and Inco 3, Inc., et al., Defendants Below, Appellees.**

**Donald G. MICHELS and Inco 3, Inc., Defendants and Second–Party Plaintiffs Below, Appellees,**

v.

**David R. REXROAD and Lynne W. Rexroad, Second–Party Defendants Below, Appellees.**

**No. 21822.**

Supreme Court of Appeals of West Virginia.

Submitted May 3, 1994.

Decided June 15, 1994.

James A. Varner, Catherine D. Munster, McNeer, Highland & McMunn, Clarksburg, for Jolynne Corp., and David R. and Lynne W. Rexroad.

R. Clarke Vandervort, Mark A. Toor, Robinson & McElwee, Charleston, for Donald G. Michels and Inco 3, Inc.

NEELY, Justice:

The Jolynne Corporation appeals a jury verdict in the Circuit Court of Upshur County holding valid an oil and gas lease on Jolynne's property leased to Donald G. Michels and INCO 3, Inc. (hereinafter Mr. D. Michels). Jolynne maintains that, because of misleading instructions, the jury failed to find the oil and gas lease abandoned even though the evidence shows that Mr. D. Michels produced no oil or gas under the lease for at least 10 years. Mr. D. Michels maintains that the lease was not abandoned and that David R. and Lynne W. Rexroad, Jolynne's predecessors in interest, had acknowledged the lease's validity by various actions including notation of the lease in their deed. Because the evidence shows that the lease expired under its own terms and under the circumstances of this case, the equitable defenses are not applicable, and we reverse the circuit court.

On 6 June 1958, the Conference Board of Trustees of the Evangelical United Brethren Church granted an oil and gas lease to Franklin E. Michels (hereinafter Mr. F. Michels) on a one hundred twenty-two (122) acre tract that the Church owned in the Buckhannon District of Upshur County. The lease's initial term was for two years and then "as long thereafter as the said land is operated by the Lessee in the search for or production of oil or gas...." The lease provided that the lessor would receive free gas up to one hundred thousand cubic feet per year and would pay wholesale rates for additional gas purchased. The "measurement and regulation [of the Church's gas use] shall be by meter and regulators set at the tap on the well or line by the Lessee." The lease provided that a one-eighth (⅛) royalty was to be paid to the Church and stated that "the Lessee shall have the right at any time to surrender this lease, or from time to time any part or parts of the leased land...." In 1958, Mr. F. Michels assigned the lease to INCO 3, Inc., a closely-held corporation owned by Mr. F. Michels and operated by his sons, and after a successful gas well was drilled, production began. In 1965, except for fifty (50) acres surrounding the producing gas well, Mr. F. Michels released the rest of the tract from the lease. Donald G. Michels, an appellee, is the successor in interest of his father, Franklin E. Michels.[1]

According to the record, the Church used the property as a church camp and, until 1972, used the well's gas to heat its buildings. Between 1959 and 1972, Mr. F. Michels paid or credited royalties to the Church; the Church paid Mr. F. Michels for an amount for gas used in excess of 100,000 cubic feet; and Hope Natural Gas Company purchased gas from the well.[2] However, no evidence suggests any gas was produced after 1973 until the Fall of 1982 when Mr. Rexroad, the Church's successor in interest, repaired the well and began using the well's gas. Between 1973 and 1982, no royalties were paid, the lessee's tax returns indicate no sales, and the Church purchased gas from a commercial gas company.[3] The well's road became overgrown with small trees and briars, and the well fell into disrepair and became rusty. In approximately 1978, because of a gas leak, the Church closed some of the well's valves. About 1980, the Church ceased holding meetings on the property.

Between 1973 and 1982, the well received little attention from the lessee. Although the 1974 estate appraisement for Zelma Michels, the wife of Franklin and mother of Donald Michels, noted her ownership of a ¹⁄₃₂ working interest in the well, the 1980 estate appraisement for Franklin Michels failed to note any interest in the well although noting his interests in other wells, leases and gas companies. Mr. D. Michels testified in about 1979 he unsuccessfully attempted to sell the well's gas to a brick company and about a year later he contacted the Church concerning donating the well.

By deed dated 31 May 1982, the Board of Trustees of the West Virginia Annual Conference of the United Methodist Church[4] conveyed the 122 acre tract to Mr. Rexroad. The 1982 deed contained the following:

1. On 3 April 1980, Franklin E. Michels died. Mr. F. Michels devised his estate to his wife who had predeceased him leaving as issue two sons, Charles F. and Donald G. Michels. By assignment dated 1 January 1983, Charles F. Michels assigned to Donald G. Michels all of his right, title and interest in the lease.

2. Although on 5 February 1973, the Church was billed for "Your gas purchases for 1973," gas production apparently ceased in 1972 based on Mr. F. Michels' written contemporaneous memoranda noting "Last Production Oct. 13, 1972," and "no production 1973."

3. Although, Rodney Murphy, Service Supervisor for Mountaineer Gas Co. said, "[T]he only thing I know is, the well went bad years ago and they [the Church] used to turn our gas in and when they would get the well working again they would shut out [sic] gas off." Mr. Murphy also testified that he did not know anything about the gas well, did not know if the well was producing, and did not know when his company's meter was installed. The record shows that a commercial gas meter was installed in 1969 and that between 1972 and 1982 the Church used sufficient commercial gas to service all the tract's needs.

4. According to the deed, the United Methodist Church was formed in 1968 by a merger of the Evangelical United Brethren Church and the Methodist Church.

This conveyance is expressly made subject to any easements visible on the ground and to the following:

....

4. Oil and gas lease dated June 6, 1958, and of record in said Clerk's office in Oil and Gas Lease Book 35, at page 125, granted to Franklin E. Michels, which said oil and gas lease has been partially released by virtue of releases recorded in said Clerk's office in Release Books 57 and 58, at pages 317 and 40, respectively. ·

...

Reference is hereby expressly made to all of the instruments hereinabove mentioned and described for a further description of the property hereby conveyed and for a more particular description of all the terms and provisions of said instruments which are hereby incorporated herein by reference.

Subject to the above-mentioned rights of way, easements, agreements and leases said parties of the first part covenant that they will warrant specially the property hereby conveyed....

On 20 September 1982, Mr. Rexroad conveyed an undivided one-half interest in the property to Lynne W. Rexroad, his wife. In 1982, before the Rexroads serviced the wellhead, no gas could be produced because of the well's condition and no service lines were connected to the well. The Rexroads were billed $1,500 for their 1982 well service and gas line work. Shortly after the Rexroads' repairs, Mr. D. Michels, in December 1982, had the well partially swabbed at a cost of $3,464.86.[5] However, even after the swabbing, no meter was installed and except for the Rexroads' use ·of the gas, no gas was used or sold. In about 1984 Mr. Rexroad negotiated with Mr. D. Michels to purchase the lease but no agreement was signed.

In 1986, Wayne Davis, the President of the West Virginia Canine College, Inc. an intervenor defendant below, began renting a portion of the Rexroads' tract and using the well's gas without an additional payment. The Canine College trains handlers and dogs for the Narcotic Detector Dog Program and Police Patrol Program. During 1987, the Rexroads and Mr. Davis unsuccessfully negotiated for the sale of the entire 122 acre tract. Apparently, during the sale negotiations, Mr. Rexroad prepared two Adjustments to Appraisal that said that "the gas well is owned by others...."[6] Mr. Davis testified that before the sale, Mr. Rexroad told him that as the landowner Mr. Rexroad could file with the State to take the leasehold back or he could buy back the lease.

In July 1988, the Rexroads sold the surface of a 13.65 acre portion of their 122 acre tract to the Canine College. The 9 July 1988 deed from the Rexroads to the Canine College excepted and reserved to the Rexroads "all of the coal, oil and gas in and underlying said property hereinabove conveyed together with any right to free gas for the use in a dwelling." Although the 13.65 surface acres conveyed to the Canine College included most of the buildings used for the Church camp including a house, an administration building, a chapel, two dormitories, a swimming pool and an outdoor pavilion, the 13.65 acres did not include the site of the gas well. A July 1988 agreement signed by Mr. Rexroad and Mr. Davis, both as an individual and as President of the Canine College, stated in paragraph 7:

> The premises are presently heated by the use of free gas from a gas well on the property. However, the gas well is owned by others and the free gas cannot be depended on indefinitely. The lease does provide that free gas shall be provided for at least one (1) dwelling at all times and that gas for other buildings can be purchased for wholesale. However, said well could be purchased for approximately $5,000.00–$6,000.00 and eliminate any question of adequate free gas for the future.

---

5. Although Jolynne acknowledges that the lessees had some work performed on the well in 1982, it alleges that the work was incomplete. Apparently, larger equipment was needed to reach the bottom of the well and Mr. D. Michels stopped the work.

6. During the sale negotiations, Mr. Rexroad used a 1979 property appraisal prepared by the Church that he updated with Adjustments to the Appraisal. Both Mr. Rexroad's 1987 and 1988 Adjustments to the Appraisal contained the following statement:

It is agreed and understood that in the event Buyers [the Canine College] purchase the gas well on the EvUnBreth Acres premises, then Seller [the Rexroads] shall have free gas to both the dining hall and shop, and Seller agrees not to charge a royalty for gas used by the Buyers for so long as Seller is also using the gas in the two (2) buildings above referred to.

On the 108 acres remaining with the Rexroads, there was a house and a golf course that used the two buildings mentioned in the July 1988 agreement.

In November 1989, Mr. Davis had the well swabbed and some of the gas line replaced at a cost of $1,159.17.[7] Mr. Rexroad testified that he knew the well was serviced because he saw the contractors at the well.

In late 1988 or early 1989, Mr. Davis unsuccessfully negotiated with Mr. D. Michels to purchase the lease. By deed dated 1 October 1990, the Rexroads transferred their interest in the gas in and around the 50 acres that had not been officially released from the lease to Jolynne, a closely held corporation in which the Rexroads are major stockholders.[8] On 31 October 1990, the Canine College entered into an agreement with Mr. D. Michels to pay $1,000 for its gas use and to purchase the well. In November 1990, Mr. Davis said that Mr. Rexroad informed him that because the Rexroads' property was not getting sufficient gas, Mr. Davis' gas would be shut off. Mr. Davis also testified that Mr. Rexroad advised him not to buy the well.

On 30 November 1990, Jolynne instituted suit against Mr. Michels, INCO 3 and others with an interest in the lease to have the lease declared abandoned. Mr. Michels and INCO answered and filed a counterclaim against the Rexroads. The Canine College answered

as a party with an interest in the lease, based on its option to purchase the lease and filed a counterclaim against Jolynne and the Rexroads.[9]

The case was submitted to a jury, which found that the lease was not terminated or forfeited because of abandonment.[10] After the circuit court refused Jolynne's motion to set aside the jury verdict, Jolynne appealed to this Court asserting that: (1) Jolynne is entitled to judgment as a matter of law because of the abandonment of the lease; (2) the circuit court erred in submitting the defendants' equitable defenses to the jury; and (3) the circuit court erred by incorrectly instructing the jury on the effect of a deed's recitation of recorded encumbrances. The appellees maintain that: (1) the lease was not terminated or abandoned; (2) the jury properly considered the equitable defenses; and (3) the jury was properly instructed.

I

■ In *McCullough Oil, Inc. v. Rezek,* 176 W.Va. 638, 346 S.E.2d 788 (1986), we discussed the structure and meaning of an oil and gas lease. In Syl. pt. 1 *McCullough,* we noted the dual nature of an oil and gas lease and its usual commercial purpose by stating:

An oil and gas lease (or other mineral lease) is both a conveyance and a contract. It is designed to accomplish the main purpose of the owner of the land and of the lessee (or its assignee) as operator of the oil and gas interests: securing production of oil or gas or both in paying quantities, quickly and for as long as production in paying quantities is obtainable.

■ In this case, the dual nature of the lease is apparent, but the appellees argue that unlike the sole commercial purpose of

---

7. ·After this civil action was filed, Mr. Davis had the well serviced in January 1991 at a cost of $300.00 and in December 1991 at a cost of $950.29.

8. Although dated 1 October 1990, the deed from the Rexroads to Jolynne was not recorded until 22 January 1993.

9. Part of the Canine College's counterclaim was bifurcated and a separate civil action was instituted by the Canine College alleging attorney

malpractice, tortuous interference with business relations and breach of fiduciary duty. *See W. Va. Canine College v. Rexroad,* 191 W.Va. 209, 444 S.E.2d 566 (1994) upholding the dismissal of the Canine College's amended complaint against Roy D. Law, the lawyer who prepared a title report for the 13.65 acre tract, which the Canine College purchased from the Rexroads in 1988.

10. The appellees' brief indicates that after the jury verdict Mr. Michels and INCO assigned their interest in the lease to Mr. Davis.

the *McCullough* lease, this lease also has as a major purpose the production of gas for the lessor's consumption. According to the appellees, Franklin Michel developed the well to assist his Church by providing gas to heat its camp. We reject this argument because of our well established rule, stated in Syl. pt. 3, *Iafolla v. Douglas Pocahontas Coal Corp.*, 162 W.Va. 489, 250 S.E.2d 128 (1978):

> A written contract merges all negotiations and representations which occurred before its execution, and in the absence of fraud, mistake, or material misrepresentations extrinsic evidence cannot be used to alter or interpret language in a written contract which is otherwise plain and unambiguous on its face.

*In accord* Syl. pt. 1, *Warner v. Haughi, Inc.*, 174 W.Va. 722, 329 S.E.2d 88 (1985); Syl. pt. 1 *Buckhannon Sales Co., Inc. v. Appalantic Corp.*, 175 W.Va. 742, 338 S.E.2d 222 (1985) ("where the meaning [of a contract] is uncertain and ambiguous, parole evidence is admissible . . ."). In this case, the lease stated that it was "for the sole and only purpose of operating for and producing oil and gas. . . ." Even assuming that the lease had a noncommercial purpose, the record indicates that after 1973 neither purpose was fulfilled because no production of gas occurred for almost 10 years. Finally, because the lease's non-commercial purpose was directed to the Church, it expired when the Church sold the property to Mr. Rexroad.

■ In *McCullough*, we noted that "[o]ne of the conveyancing portions of an oil and gas lease is the 'habendum' clause, also known as the 'term' clause." *McCullough*, 176 W.Va. at 642, 346 S.E.2d at 793. In Syl. pt. 2, *McCullough*, we stated:

> A habendum clause in an oil and gas lease (or other mineral lease) providing for a short primary term and a secondary term for "so long as" production in paying quantities or operations therefor continue, or similar language, conveys a "determinable" interest, that is, an interest subject to a special limitation. Such an interest automatically terminates by its own terms upon the occurrence of the stated event, namely, expiration of the primary term without production or operations at such

time, or the cessation of production or operations during the secondary term.

*See Wilson v. Xander*, 182 W.Va. 342, 344, 387 S.E.2d 809, 811 (1989).

■ This lease's primary term was for two years and its secondary term was for "as long thereafter as the said land is operated by the Lessee in the search for or production of oil or gas." In *McCullough, supra*, 176 W.Va. at 643–44, n. 5, 346 S.E.2d at 794, n. 5, we discussed the "imprecise common law doctrine of temporary cessation of production (which allows a 'reasonable' period of time to resume operations)" and the factors to be considered in deciding when a cessation of production is temporary.

> Factors to be considered in deciding whether a cessation of production is "temporary" include the length of time without production, the cause of the delay and whether the lessee exercised reasonable diligence to resume production. [Citations omitted].

In this case, all the factors indicate that the cessation of production was not temporary. No production occurred between 1973 and 1982, and after 1982, the only gas produced was for domestic use. Although Mr. D. Michels argues that production is occurring because of the Rexroads' gas consumption, the Rexroads' use of free gas does not constitute consideration sufficient to bind them to the lease and does not amount to production. In Syl. pt. 2, *Goodwin v. Wright*, 163 W.Va. 264, 255 S.E.2d 924 (1979), we stated:

> When a well is not producing in paying quantities and no royalties or rentals are being received by the lessors, these being required by the terms of a lease as necessary to its continuation, receipt by lessors of free gas for domestic purposes from the well does not constitute consideration sufficient to keep lessors bound by the lease, nor does it amount to "production."

*See Bruen v. Columbia Gas Transmission Corp.*, 188 W.Va. 730, 426 S.E.2d 522 (1992) (recognizing the difference between flat-rate and production leases). Mr. Michels contends that the Rexroads' gas consumption extended beyond domestic purposes. How-

ever, because Mr. Michels failed to install an operational meter, as required under the lease, the amount of the Rexroads' gas consumption is conjecture. In *Goodwin*, we said, "the use of free oil or gas for domestic purposes does not, in itself, constitute production that will keep a lease in effect after the basic term." *Goodwin*, 163 W.Va. at 270, 255 S.E.2d at 927. Given the record, we find no evidence that production under the lease occurred based on the Rexroads' consumption of gas for domestic purposes.

Mr. D. Michels maintains that the Rexroads delayed the well's return to production by denying him access to the well and by consuming all of the well's gas. Although the Rexroads had a chain across the well road, contractors were able to gain access to the well for service in 1982, 1989 and 1991. The well's production capacity and the Rexroads' consumption are supposition because of the lack of a meter, the installation of which was Mr. D. Michels' responsibility.

Finally, the record shows that Mr. D. Michels did not exercise reasonable diligence to resume production. Except for a 1979 attempt to sell gas to a brick company and the 1982 well servicing, between 1973 and 1990 nothing was done by the lessee to resume production.

Based on the evidence, we find that by 1982 the lease in this case expired by its own terms upon the lessee's failure to resume operation. *See also McCullough, supra* 176 W.Va. at 647, 346 S.E.2d at 798 (9 year cessation of production found not to be temporary).

■ Mr. D. Michels' 1982 well service could not by itself revive the lease. In *McCullough, supra,* 176 W.Va. at 646, 346 S.E.2d at 796, during a discussion of a lease provision requiring notice, we noted that "the lessee could not unilaterally revive the lease. [Citations omitted.]" In this case, by 1982 when Mr. Rexroad purchased the property, the lease under its own terms had expired. Even after 1982 the lessees did not resume production within a reasonable period.

■ Jolynne also maintains that under *W.Va.Code* 36–4–9a [1979] the lease is considered abandoned. *W.Va.Code* 36–4–9a [1979] creates a statutory rebuttable presumption of abandonment where the lessee fails to produce and sell or produce and use for its own purpose oil and gas for a period of greater than twenty-four months, subsequent to July 1, 1979.[11] In *Berry Energy Consultant & Managers, Inc. v. Bennett,* 175 W.Va. 92, 331 S.E.2d 823 (1985) we discussed *W.Va.Code* 36–4–9a [1979] and noted that the lessee can lose the right under a lease to produce oil or gas. Syl. pt. 1, *Berry Energy,* states:

"The discovery of oil or gas under a lease giving right of exploration and production, unless there is something in the lease manifesting a contrary intention, is sufficient to create [a] vested estate in the lessee in the exclusive right to produce oil or gas provided for therein—a right, however, which may be lost by abandonment, by failure to

11. *W.Va.Code* 36–4–9a [1979] states, in pertinent part:

There shall be a rebuttable legal presumption that the failure of a person, firm, corporation, partnership or association to produce and sell or produce and use for its own purpose for a period of greater than twenty-four months, subsequent to the first day of July, one thousand nine hundred seventy-nine, oil and/or gas produced from such leased premises constitutes an intention to abandon any oil and/or gas well and oil and/or gas well equipment situate on said leased premises, including casing, rods, tubing, pumps, motors, lines, tanks, separators, and any other equipment used in the production of any oil and/or gas from any well or wells on said leasehold estate.

This rebuttable presumption shall not be created in instances (i) of leases for gas storage purposes, or (ii) where any shut-in royalty, flat rate well rental, delay rental, or other similar payment designed to keep an oil or gas lease in effect or to extend its term has been paid or tendered, or (iii) where the failure to produce and sell is the direct result of the interference or action of the owner of such oil and/or gas or his subsequent lessee or assignee. Additionally, no such presumption shall be created when a delay in excess of twenty-four months occurs because of any inability to sell any oil and/or gas produced or because of any inability to deliver or otherwise tender such oil and/or gas produced to any person, firm, corporation, partnership or association.

Although *W.Va.Code* 36–4–9a [1979] provides several exceptions to the rebuttable presumption, none applies in this case. *See supra* at 412, 446 S.E.2d at 501 for a discussion of Mr. D. Michels' argument alleging the Rexroads' interfered with production.

produce oil or gas, or pursue the work of production, or development of the property." Syl. pt. 4, *Eastern Oil Co. v. Coulehan,* 65 W.Va. 531, 64 S.E. 836 (1909). In *Warner,* 174 W.Va. at 730, 329 S.E.2d at 97, we noted "that the element of intent is the principal distinguishing factor between abandonment and forfeiture."

Jolynne maintains that the lessee's intent to abandon the lease was shown by the long cessation of production and by the lessee's failure to include the lease in the 1980 appraisal of Mr. F. Michels estate. Mr. D. Michels testified he did not intend to abandon the lease and emphasizes his 1982 well servicing, his negotiations to sell the lease with both Mr. Rexroad and Mr. Davis and his 1979 attempt to sell gas to a brick company. Although the element of intent usually presents a disputed factual question, the record in this case contains insufficient evidence to overcome *W.Va.Code* 36–9–4a [1979]'s presumption of abandonment.

We therefore find that as a matter of law, by 1982 the lease in this case expired under its own terms.

## II

Jolynne next maintains that the jury should not have considered the appellees' equitable defenses of estoppel by deed, laches, or equitable estoppel because these defenses are not applicable. Jolynne alleges that the jury was incorrectly instructed on several issues including estoppel by deed.

### A.

■ Mr. D. Michels argues that because Mr. Rexroad accepted the deed from the Church with knowledge of the recited encumbrance, he became estopped from claiming the lease was abandoned before he purchased the property.

*W.Va.Code* 36–1–11 [1923] states:

When any real property is conveyed or devised to any person, and no words of limitation are used in the conveyance or

devise, such conveyance or devise shall be construed to pass the fee simple, or the whole estate or interest, legal or equitable, which the testator or grantor had power to dispose of, in such real property, unless a contrary intention shall appear in the conveyance or will.

In *Freudenberger Oil Co. v. Simmons,* 79 W.Va. 46, 90 S.E. 815 (1916), we noted that under *W.Va.Code* 36–1–11 [1923] a deed conveying land, in the absence of an exception to the contrary, passes the entire interest of the grantor. Syl. pt. 1, *Freudenberger* states:

A deed conveying lands, unless an exception is made therein, conveys all the estate, right, title, and interest whatever, both at law and in equity, of the grantor in and to such lands.

■ Many deeds contain exceptions and reservations that restrict the interest passed by the grantor.[12] However, neither exceptions nor reservations can create a right to the transferred property in persons who are strangers to the deed, because "property cannot be conveyed by reservation" and "property which is excepted is not granted." *Erwin v. Bethlehem Steel Corporation,* 134 W.Va. 900, 916, 62 S.E.2d 337, 346 (1950) (quoting 26 C.J.S., Deeds, §§ 140c and 140a). Syl. pt. 3, *Erwin* states:

A reservation or an exception in favor of a stranger to a conveyance does not serve to recognize or confirm a right which does not exist in his favor when the conveyance which contains such reservation or exception is made.

*See* Syl. pt. 3, *Beckley Nat. Exchange Bank v. Lilly,* 116 W.Va. 608, 182 S.E. 767 (1935) (a reservation that is treated as an exception "cannot operate actually to vest rights to the property excepted in persons who are strangers to the instrument").

Mr. D. Michels' estoppel by deed argument fails to distinguish between a deed's exceptions or reservations, which can give rise to estoppel by deed and a deed's recitations of easements leases, or other instruments,

---

12. Although an exception is used by a grantor to preserve or retain his preexisting right and a reservation creates a new right, the words are usually used interchangeably and their effect must be determined by the circumstances of the particular case. *See Sally–Mike Properties v. Yokum,* 175 W.Va. 296, 300, 332 S.E.2d 597, 600 (1985).

which involve third parties. Mr. D. Michels' reliance on *Richardson v. Hardman*, 97 W.Va. 573, 576, 125 S.E. 442, 444 (1924), is misplaced because the *Richardson* deed involved "an express reservation to the grantor of ⅛ of the coal, oil and gas royalties" that had guided the rent and royalty distribution for about 10 years. Syl. pt. 1, *Richardson*, states:

> A *deed poll*, after acceptance by the grantee, becomes the *mutual act of the parties;* and their successors, while claiming thereunder, cannot repudiate its provisions which are repugnant to their interests. This principle should be applied, especially where the grantee and those claiming under him have subsequently, by written acts, confirmed the unfavorable provisions of the conveyance and for many years acquiesced therein, accepting rents and royalties according to the terms of the deed. [Emphasis added.]

In this case, although the lease was recited in the deed as an instrument that should be considered by the grantee, because the lease is set forth in the deed as neither an exception nor a reservation, estoppel by deed cannot be used to require finding the lease valid.

■■ Jolynne argues that the jury at the appellees' request was given an incorrect, binding instruction on the estoppel by deed issue.[13] In Syl. pt. 5, *Yates v. Mancari*, 153 W.Va. 350, 168 S.E.2d 746 (1969), we stated:

> "An erroneous instruction is presumed to be prejudicial and warrants a new trial unless it appears that the complaining party was not prejudiced by such instruction."

13. Defendants' Instruction No. 12 stated:
   When a party accepts a valid deed, that party is bound by each and every provision of that deed and may not deny the validity of individual provisions within the deed. This legal principle is referred to as estoppel by deed. This principle has been explained in the following way: *"(o)ne who claims under a deed confirms all its provisions, and cannot establish his claim by adopting only those provisions which are in his favor, while he repudiates or contradicts other [sic] that are repugnant to his interests."* The deed by which David Rexroad took ownership of the subject property in 1982 contains an express recognition of the 1958 lease. If you find that David Rexroad accepted the 1982 Deed and that the 1982 Deed contained

Point 2, syllabus, *Hollen v. Linger*, 151 W.Va. 255 [151 S.E.2d 330 (1966)].

In accord, Syl. pt. 2, *Myers v. Morgantown Health Care Corp.*, 189 W.Va. 647, 434 S.E.2d 7 (1993); Syl. pt. 8, *Kodym v. Frazier*, 186 W.Va. 221, 412 S.E.2d 219 (1991); Syl. pt. 8, *Rahall v. Tweel*, 186 W.Va. 136, 411 S.E.2d 461 (1991).

Defendants' Instruction No. 12 was based on *Richardson*, *supra*, which is not applicable to this case. *See supra* at 414, 446 S.E.2d at 503 for a discussion of *Richardson*. Because Defendants' Instruction No. 12 contained an incomplete statement of the law that was confusing, it should not have been given to the jury.[14]

## B

■■■ Mr. D. Michels asserts that the doctrine of laches bars Jolynne from asserting that the lease was forfeited or abandoned because the Rexroads lacked diligence in pursuing their claim and prejudice resulted to the party asserting the defense.[15] "The general rule in equity is that mere lapse of time, unaccompanied by circumstances which create a presumption that the right has been abandoned, does not constitute laches." Syl. pt. 4, *Stuart v. Lake Washington Realty Corp.*, 141 W.Va. 627, 92 S.E.2d 891 (1956). *In accord* Syl. pt. 4, *Laurie v. Thomas*, 170 W.Va. 276, 294 S.E.2d 78 (1982). We recognized in *Laurie*, 170 W.Va. at 279, 294 S.E.2d at 82, that "[l]aches however may be applied where bona fide rights of third parties have intervened or where by virtue of some other event, it is inequitable to enforce the claim."

an express recognition of the 1958 Lease, then you must conclude that the plaintiff can make no claim that the 1958 Lease was abandoned before David Rexroad purchased the property and determined that the lease was not abandoned by the defendants.

14. Defendants' Instruction Nos. 11 and 16 also incorrectly instructed the jury on the issue of estoppel by deed.

15. Because no evidence was introduced to justify disregarding Jolynne's corporate status, Defendants' Instruction No. 2 allowing the jury to consider Jolynne's separate legal status should not have been given.

*See* Syl. pt. 2, *Mundy v. Arcuri,* 165 W.Va. 128, 267 S.E.2d 454 (1980).

■ Mr. D. Michels argues that Mr. Rexroad allowed eight years to lapse before bringing his suit and that during that time because of Mr. Rexroad's delay, Mr. D. Michels continued to service the well. Jolynne argues the equity doctrine of "clean hands" bars Mr. D. Michels' laches defense because it was Mr. D. Michels' delay in producing gas from the lease that led to this action and that Mr. D. Michels failed to show he was prejudiced by the Rexroads' delay. Although the record shows that Mr. D. Michels serviced the well once in 1982, this service could not have resulted from Mr. Rexroad's delay. Because Mr. D. Michels has not shown any prejudice to him because of the Rexroads' delay, the doctrine of laches is not applicable to determining the status of the lease. Defendants' Instruction No. 13 incorrectly allowed the jury to consider the defense of laches in determining if the well was abandoned and should not have been given to the jury.[16]

## C

■ Jolynne maintains that the doctrine of equitable estoppel is not applicable because the Rexroads did not hinder the lessee's performance and Mr. D. Michels did not use due diligence toward production. Mr. D. Michels argues that the Rexroads engaged in a pattern of deceptive conduct that lead to his negotiations with the Canine College to sell the lease.

**16.** Defendants' Instruction No. 13 states:

The law will not permit a party to delay the exercise of its potential rights for a long period of time if that delay causes harm to another party. This principle is known in the law as the doctrine of laches. A party cannot assert a claim which it may otherwise have a right to assert if it slept on its right delaying an assertion of its right and while doing so, another party, relying upon the circumstances as they continued to exist, acted in such a way that it would be harmed if the circumstances were changed. There are two (2) elements of the doctrine of laches: (1) lack of diligence by the party against whom laches is asserted, and; (2) prejudice to the party asserting the defense. David Rexroad purchased the property in this case in 1982 and accepted a deed that specifically listed the lease. He did not seek to

■ Our general rule on the doctrine of equitable estoppel was stated in Syl. pts. 6 and 7, *Stuart supra.*

The general rule governing the doctrine of equitable estoppel is that in order to constitute equitable estoppel or estoppel in pais there must exist a false representation or a concealment of material facts; it must have been made with knowledge, actual or constructive of the facts; the party to whom it was made must have been without knowledge or the means of knowledge of the real facts; it must have been made with the intention that it should be acted on; and the party to whom it was made must have relied on or acted on it to his prejudice.

Syl. pt. 6, *Stuart.*

To raise an equitable estoppel there must be conduct, acts, language or silence amounting to a representation or a concealment of material facts.

Syl. pt. 7, *Stuart. See Daniel v. Stevens,* 183 W.Va. 95, 100, 394 S.E.2d 79, 84 (1990).

This Court discussed equitable estoppel in the context of a oil and gas lease in *Wilson, supra.* In *Wilson,* the original lessees, Wilson and Lockhart, claimed that the value of the leasehold was destroyed because of a failure to deliver clear title to the property. The lessees alleged that the defendants' action should estop the defendants from denying the lessees' lease. In *Wilson,* 182 W.Va. at 344, 387 S.E.2d at 811, we noted that although "the courts will normally honor the letter of the lease ...[, i]n rare cases, howev-

challenge the validity of the lease until 1990 when he filed the suit to have it deemed abandoned; a delay of more than eight years. The Michels and the College expended money in servicing the gas well during that period based on the belief that the gas lease remains valid and in force. In addition, just before this lawsuit was filed, Michels and the College entered into an agreement for the College to purchase the lease and the College paid Michels money for that purchase. If you find that the Rexroads did not act diligently in asserting their claim that the leasehold was abandoned and because of the Rexroad's delay, Michels and the College were prejudiced or harmed, then you must conclude that the plaintiff has no right to claim that the leasehold is abandoned and determine that the lease was not abandoned by the defendants.

er, the lessor may himself hinder the lessee's performance, precipitating the special limitation and defeasance of the lessee's estate." Syl. pt. 1, *Wilson* states:

> When the *habendum* clause in an oil and gas lease requires drilling or production within the primary term for the lessee to avoid forfeiture and termination of the lease, the courts will normally honor the letter of the lease; however, if the lessor himself hinders the lessee's performance, precipitating the special limitation and defeasance of the lessee's estate, the doctrine of equitable estoppel effectively extends the lease for the reasonable time that justice may require for the lessee to begin production unhindered and avoid the special limitation.

"For the lessee in an oil and gas lease to make out a theory of estoppel to prevent defeasance of his estate because of misconduct by the lessor, the lessee is required to use due diligence toward production; however, the lessee's degree of diligence is a factual question." Syl. pt. 2, *Wilson.*

In this case, Mr. D. Michels alleges that because of the Rexroads' conduct with a third party, the Canine College, Jolynne should be estopped from denying the lease. However none of the Rexroads/Canine College acts hindered Mr. D. Michels' performance under the lease. The record shows that except for one well servicing in 1982 and a gas sale attempt in 1979, between 1972 and 1990, Mr. D. Michels did nothing to return the well to production. Although the lessee's degree of diligence is a factual question, in this case the evidence is overwhelming that between 1972 and 1982 and even beyond, Mr. D. Michels did not use due diligence toward returning the well to production.

Defendants' Instruction No. 14 incorrectly allowed the jury to consider the Rexroads' conduct with the Canine College to justify Mr. D. Michels' equitable estoppel argument.

**D**

The Canine College maintains that based on the Rexroads' conduct with regard to it, the doctrines of laches and equitable estoppel should be considered by the jury. The Canine College alleges that the Rexroads led it to believe that the lease was valid and could be purchased by the College thereby securing for the Canine College free gas. The Canine College maintains its belief in the continued validity of the lease was based on the following: (1) The two Adjustments to the Appraisal given to it by the Rexroads during their 1987 negotiations to purchase the entire tract, that said "the gas well is owned by others ... [, h]owever, said well could be purchased for approximately $5,000.00–$6,000.00 and eliminate any question of adequate free gas for the future;" (2) The 1988 agreement between it and the Rexroads which determined the parties' access to free gas "in the event Buyers [Canine College] purchase the gas well;" and (3) The filing of this cloud on title suit within one month after the Canine College entered into an option agreement with Mr. D. Michels to purchase the well.[17]

Based on the College's belief in the lease's continued validity, the Canine College claims they purchased 13.65 surface acres from the Rexroads for $400,000, negotiated with Mr. D. Michels to buy the lease, paid to have the well serviced several times[18], and entered into an option agreement to buy the lease.[19]

Jolynne alleges that Mr. Rexroad told Mr. Davis, President of the Canine College, that as the landowner, Mr. Rexroad could resolve the question of well ownership by either buying back the lease or bringing suit to have the well declared abandoned.

Although the Canine College's allegations are asserted as equitable defenses, these allegations are essentially charges of *fraud and deceit* by the Rexroads. In this case, the Canine College is an intervenor and Mr.

---

**17.** The Canine College also alleges that the Rexroads, who are both lawyers, prepared for the College various documents anticipating the College's purchase of the lease.

**18.** The Canine College serviced the well in 1989 and twice in 1991—the 1991 services occurred after the complaint was filed.

**19.** The October 31, 1990 agreement required the College to pay $1,000 for its gas use and outlined the terms and conditions for the Canine College's gas use and its eventual purchase of Mr. D. Michels' interest in the well. However, according to the parties, after the jury verdict, Mr. Davis, rather than the College, purchased Mr. D. Michels' interest in the well.

D. Michels, who is a stranger to the alleged acts of fraud and deceit, should not benefit from them. If we allow the Canine College's allegations to form equitable defenses, this case would be unmanageable. If the lease is found not abandoned or forfeited, a dilatory lessee is rewarded. If the lease is awarded to the College, Jolynne has the right to free gas and unless the well does more than produce for domestic consumption, another lawsuit awaits. If free gas is awarded to the College, who has first claim on the gas, who is the lessee and who pays to maintain the well?

The Canine College's allegations were raised as both equitable defenses and in its counterclaim against the Rexroads. The circuit court bifurcated the counterclaim and these issues have been raised in *W. Va. Canine College v. Rexroad. See supra* note 9. Because the Canine College's allegations will be considered in a separate action, we find it unnecessary to consider them here and thus eliminate the possibility of a double recovery.[20]

For the above stated reasons, the judgment of the Circuit Court of Upshur County is reversed.

Reversed.

---

**20.** Defendants' Instruction Nos. 14, 15, 17 and 18 refer primarily to the related case. *See Ca-* *nine College v. Rexroad, supra* note 9.