**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 17-1336**

GEROLD W. BERGHOFF; BONNIE D. BERGHOFF,

Plaintiffs - Appellants,

v.

CHESAPEAKE APPALACHIA, LLC; SWN PRODUCTION COMPANY, LLC,

Defendants - Appellees.

Appeal from the United States District Court for the Northern District of West Virginia, at Wheeling.  John Preston Bailey, District Judge.  (5:15-cv-00126-JPB)

Argued:  May 8, 2018                          Decided:  August 24, 2018

Before KEENAN, WYNN, and DIAZ, Circuit Judges.

Vacated and remanded by unpublished opinion.  Judge Diaz wrote the opinion, in which Judge Keenan and Judge Wynn joined.

**ARGUED:** Jeremy Matthew McGraw, BORDAS & BORDAS, PLLC, Moundsville, West Virginia, for Appellants.  Lucas Liben, REED SMITH LLP, Pittsburgh, Pennsylvania, for Appellees.  **ON BRIEF:** James G. Bordas, Jr., BORDAS & BORDAS, PLLC, Wheeling, West Virginia, for Appellants.  Nicolle R. Snyder Bagnell, Kevin C. Abbott, REED SMITH LLP, Pittsburgh, Pennsylvania, for Appellee Chesapeake Appalachia, L.L.C.  Matthew S. Casto, Timothy M. Miller, BABST CALLAND, P.C., Charleston, West Virginia, for Appellee SWN Production Company, LLC.

Unpublished opinions are not binding precedent in this circuit.

DIAZ, Circuit Judge:

In this oil and gas appeal from the Mountain State, Gerold and Bonnie Berghoff dispute whether Chesapeake Appalachia ("Chesapeake"), and its successor in interest, SWN Production ("SWN"), extended the length of their mineral lease by triggering the agreement's habendum clause. The district court concluded they had satisfied the requirements of the habendum clause, and granted summary judgment in favor of Chesapeake and SWN. The Berghoffs now appeal, arguing the district court improperly resolved a disputed issue of material fact and incorrectly interpreted the lease's pooling provision. We agree, and therefore vacate and remand for further proceedings.

I.

A.

In November 2006, the Berghoffs executed a mineral lease granting Great Lake Energy Partners the right to extract oil and gas from a 155-acre portion of their property (the "Property") in Ohio County, West Virginia. The agreement consists of a five-year primary term, which ended on November 27, 2011, followed by a conditional secondary term. The requirements to carry over and maintain the lease are laid out in the habendum clause[1] in Paragraph 2:

---

[1] "Habendum" stems from the Latin phrase meaning "to have and to hold" and was traditionally used in deeds to define the duration of the estate conveyed. *Habendum clause*, Black's Law Dictionary (10th ed. 2014). Such provisions are fairly common in oil and gas leases today, and permit the lease to continue in operation so long as the property produces oil. *McCullough Oil, Inc. v. Rezek*, 346 S.E.2d 788, 793 (W. Va. 1986).

3

> This lease shall continue in force and the rights granted hereunder be quietly enjoyed by the Lessee for a term of five (5) years and so much longer thereafter as oil, gas, and/or coalbed methane gas or their constituents are produced or are capable of being produced on the premises in paying quantities, in the judgment of the Lessee, or as the premises shall be operated by the Lessee in the search for oil, gas, and/or coalbed methane gas.

J.A. 65.

The agreement also includes a pooling provision, permitting Great Lake Energy Partners, or its successor in interest, to combine the Property with neighboring parcels in order to create a common production unit. The lessee's power to pool is set forth in Paragraph 10:

> Lessor hereby grants to the Lessee the right at any time to consolidate the leased premises or any part thereof or strata therein with other lands to form a[n] oil, gas, and/or coalbed methane gas development unit . . . for the purpose of drilling a well thereon, but the Lessee shall in no event be required to drill more than one well on such unit. Any well drilled on said development unit whether or not located on the leased premises, shall nevertheless be deemed to be located upon the leased premises within the meaning and for the provisions and covenants of this lease to the same effect as if all the lands comprising said unit were described in and subject to this lease . . . .

J.A. 66. Paragraph 10 further provides that to "effect such consolidation" the lessee must execute:

> a declaration of consolidation with the same formality as this oil, gas, and/or coalbed methane gas lease setting forth the leases or portions thereof consolidated, the royalty distribution and recording the same in the recorder's office at the courthouse in the county in which the leased premises are located and by mailing a copy thereof to the Lessor of the address hereinabove set forth unless the Lessee is furnished another address.

*Id.*

4

Finally, the lease includes an addendum, requiring that the "[l]ocation of any well(s), access road(s) or pipeline routes shall be approved by the Lessors or one of their representatives in writing prior to location thereof." J.A. 69. However, that approval could "not be unreasonably withheld or delayed." *Id.*

The lease was eventually assigned to Chesapeake, which retained its interest until January 2015, when it assigned the lease to SWN. Between January and November 2011, Chesapeake surveyed and staked the Property in preparation for the construction of a well pad. Although Mr. Berghoff agreed to the location of the well pad, he objected to the route of the access road and asked that it be moved. Chesapeake refused, claiming Mr. Berghoff's alternative path presented environmental issues since it would cross a creek. Both sides agree that discussions regarding the well pad and access road ended soon after this exchange.

In light of the disagreement with Mr. Berghoff, Chesapeake opted to build the well on an adjoining parcel of land, but close enough to the Berghoffs so that any wellbore (drill hole) could still extract oil from the Property. Between May and June 2011, Chesapeake conducted a wetlands analysis, performed baseline sampling of water resources near the new well pad site, and filed a well work permit application with the West Virginia Department of Environmental Protection (the "WVDEP"). On August 25, 2011, the WVDEP approved the permit known as the 8H Well.

Chesapeake began construction of the 8H Well on September 19, 2011, by widening a preexisting access road. A month later, Chesapeake submitted an amended work permit, seeking to extend the lateral leg of the 8H wellbore so that it would now cross under the

5

Berghoffs' land. Chesapeake also certified in a sworn statement that it had the right to pool the various lease interests that would be accessed by the extended lateral leg. Chesapeake signed and recorded an accompanying Declaration and Notice of Pooled Unit with the county clerk on November 15, 2011, forming the William Rodgers South Unit, which included the Property. The next day, the WVDEP issued the amended 8H permit. Eleven days later, the primary lease term expired.

The 8H Well was spud in December 2011, and Chesapeake began selling oil and gas produced from the well in June 2013, generating royalties for the Berghoffs and other oil and gas lessors of land within the William Rodgers South Unit. The Berghoffs have refused to cash these royalty checks. On October 13, 2013, nearly two years after the primary term had ended, Chesapeake mailed a copy of the Notice and Declaration of Pooling to the Berghoffs' address.

B.

The Berghoffs eventually filed suit in West Virginia state court against Chesapeake and SWN. Their complaint sought both declaratory relief specifying that the lease had expired at the end of its primary term, and money damages for the subsequent unauthorized extraction of oil and gas. The defendants removed the action to federal court on the basis of diversity jurisdiction, where all parties eventually moved for summary judgment.

The district court granted summary judgment to Chesapeake and SWN, holding that Chesapeake had satisfied both of the alternate conditions necessary to extend the lease under the habendum clause. To start, the court reasoned that Chesapeake's steps to place a well pad on the Property met the requirement "that, before November 27, 2011 . . . the

6

Berghoffs' property 'be operated by [Chesapeake] in the search for oil, gas, and/or coalbed methane gas.'" J.A. 624–25 (alteration in original). Though these operations were abandoned before the primary term ended, the court concluded that the "Berghoffs' own actions in unreasonably withholding consent" were responsible for the lack of "further operations on the property." J.A. 628. Thus, the Berghoffs were estopped from claiming their property was not being operated in the search for oil and gas by November 27, 2011.

Alternatively, the district court found that Chesapeake was operating the pooled William Rodgers South Unit in the search for oil or gas at the time the primary term expired. In reaching this result, the court rejected the Berghoffs' contention that Chesapeake's pooling of the Property with the neighboring parcels was ineffective because Chesapeake had failed to mail the required notice to the Berghoffs before the primary lease term expired.

This appeal followed.

## II.

We review a district court's award of summary judgment de novo, construing the facts in the light most favorable to the nonmoving party. *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 276 (4th Cir. 2015). Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Both sides agree that the

dispositive issue is whether Chesapeake extended the lease beyond its primary term by meeting the conditions of the habendum clause.[2]

Chesapeake says it did so by making plans for the construction of a well pad on the leased Property, and in the alternative, by pooling the Property with other land on which Chesapeake conducted operations. Although Chesapeake abandoned its efforts to construct a well pad on the Property, the district court applied principles of estoppel to overcome this defect.

We conclude that the record is too sparse to resolve such a fact-intensive inquiry at summary judgment. Nor may Chesapeake point to its operations on the William Rodgers South Unit as the basis for extending the lease term because it failed to comply with the requirements for pooling set forth in the lease.

A.

As an initial matter, the parties dispute whether Chesapeake's preliminary activity in surveying and staking the Property for a well pad was enough under West Virginia law to meet the requirement that "the premises shall be operated by the Lessee in the search for oil, gas, and/or coalbed methane gas." J.A. 65. The Berghoffs say that Paragraph 2 of the lease requires actual physical operations aimed at the discovery of oil while Chesapeake relies on a decision by the West Virginia Supreme Court of Appeals to claim otherwise. *See Fleming Oil & Gas Co. v. S. Penn Oil Co*., 17 S.E. 203, 207 (W. Va. 1893) (holding lessee had commenced operations for a test well by undertaking "no matter how slight . . .

---

[2] The parties also agree that West Virginia law applies to this diversity action.

8

any portion of the work which was a necessary and indispensable part of the work required"). Ultimately, we need not decide this question because Chesapeake abandoned what operations it undertook on the Property before the primary term had elapsed. *See Jolynne Corp. v. Michels*, 446 S.E.2d 494, 501–02 (W. Va. 1994) (noting that an oil and gas lessee may lose its rights under the lease "by abandonment, by failure to produce oil or gas, or pursue the work of production, or development of the property").

The district court nonetheless relied on principles of estoppel to find for Chesapeake.[3] West Virginia applies the doctrine of equitable estoppel in "rare cases" when "the lessor may himself hinder the lessee's performance." *Wilson v. Xander*, 387 S.E.2d 809, 811 (W. Va. 1989). The district court took the view that Mr. Berghoff unreasonably rejected the proposed access road route leading Chesapeake to abandon its efforts to construct a well pad on the Property. But "the determination of such reasonableness is regarded as involving factual issues," making it "a question for the jury." *Elder v. Smith*, 474 S.E.2d 590, 593 (W. Va. 1996); *accord Wilson*, 387 S.E.2d at 811. Nor does the record definitively support one conclusion—a jury could just as easily find Mr. Berghoff reasonably exercised his contractual right to approve the "[l]ocation of any well(s), access

---

[3] The appellees argue the "district court found *both* that Chesapeake had performed sufficient operations on the Property to extend the Lease *and* that Mr. Berghoff improperly prevented Chesapeake from operating on the property." Appellees' Br. at 21–22. We take a different view, particularly because the reading Chesapeake urges implies the district court needlessly considered the question of estoppel and ignored the habendum clause's use of the continuous tense. Instead, we understand the district court to have considered Mr. Berghoff's reasonableness because the secondary term lasts only so long "as the premises shall be operated . . . in the search for oil [and] gas." J.A. 65.

9

road(s) or pipeline routes." J.A. 69. This is underscored by the fact that both sides rely on the same deposition testimony by Mr. Berghoff to support their position.

West Virginia also requires that for a "lessee in an oil gas lease to make out a theory of estoppel to prevent defeasance of his estate . . . the lessee is required to use due diligence toward production." *Wilson*, 387 S.E.2d at 809. Like reasonableness, the "lessees' degree of diligence is a factual question." *Id*. Here, the evidence shows that Chesapeake waited twelve days before the primary term ended to try and pool the Property while insisting to Mr. Berghoff, "we'll put the roads where we want them." J.A. 559. Given the scant record and fact-intensive nature of the inquiry, the district court erred in deciding the issue of equitable estoppel at summary judgment.

B.

Chesapeake argues in the alternative (and the district court found) that Chesapeake's activities on the pooled unit qualify as sufficient operations to extend the lease. These activities include surveying the new well pad site, conducting wetlands analysis and baseline water sampling, obtaining a well work permit, and recording the William Rodgers South Unit. The Berghoffs respond that because Chesapeake failed to timely provide the written notice required by Paragraph 10 of the lease, their land was never properly pooled with adjoining parcels, and thus the work on the William Rodgers South Unit does not constitute operations on the leased premises. We agree.

A lessee under an oil and gas lease may not pool the estate covered by its lease except as provided for in a pooling provision. *See Jones v. Killingsworth*, 403 S.W.2d 325, 327 (Tex. 1965); *see also Tittizer v. Union Gas Corp*., 171 S.W.3d 857, 861 (Tex. 2005);

10

1-8 The Law of Pooling and Unitization § 8.03 (3d ed. 2017). And "[f]or pooling to be valid, it must be done in accordance with the method and purposes specified in the lease." *Tittizer*, 171 S.W.3d at 860.

We see no reason why the West Virginia Supreme Court of Appeals would depart from these established principles. Thus, Chesapeake was required to comply with the provisions of Paragraph 10 of the lease. Specifically, it could only "effect such consolidation by executing a declaration of consolidation . . . and recording the same in the recorder's office at the courthouse in the county in which the leased premises are located and by mailing a copy thereof to the Lessor." J.A. 66.

Under West Virginia law, "specific words or clauses of an agreement are not to be treated as meaningless, or to be discarded, if any reasonable meaning can be given them consistent with the whole contract." *Dunbar Fraternal Order of Police, Lodge No. 119 v. City of Dunbar*, 624 S.E.2d 586, 591 (W. Va. 2005) (internal quotation marks omitted). And where a lease requires the lessee to perform certain acts, "courts will normally honor the letter of the lease." *Wilson*, 387 S.E.2d at 811. This reflects the broader principle that oil and gas leases should be "liberally construed in favor of the lessor, and strictly as against the lessee." *Energy Dev. Corp. v. Moss*, 591 S.E.2d 135, 144 (W. Va. 2003).

Chesapeake doesn't dispute that it failed to mail the notice and declaration prior to the primary term expiring. Instead, Chesapeake argues that the provision's silence as to when it must mail the declaration means there is no time requirement. But this is because mailing is a prerequisite to pooling. Until Chesapeake recorded *and* mailed the declaration, it had not pooled the Property. *See Tittizer*, 171 S.W.3d at 861. Nor is the act of recordation

11

the sine qua non that Chesapeake claims. The reason case law discusses the importance of public recordation is because leases often require it. *See Mobil Oil Expl. & Producing v. Latham Expl. Co.*, 31 So. 3d 1149, 1152 (La. Ct. App. 2010); *Pampell Interests, Inc. v. Wolle*, 797 S.W.2d 392, 394 (Tex. Ct. App. 1990). The takeaway from this line of cases is not that a lessee has to record a declaration of pooling; it is that a lessee must "strictly comply with the terms of the lease." *Pampell*, 797 S.W.2d at 394.[4]

The district court excused Chesapeake's failure to comply with the letter of the lease based on the doctrine of substantial performance, which Chesapeake repeats on appeal. The doctrine of substantial performance applies where "the condition is of only minor importance," and its "nonoccurrence [is] a result of impossibility or impracticability." 14 Williston on Contracts § 43:14 (4th ed. 2018). When the mailing of the declaration is understood as the means by which Chesapeake executes its pooling power, failing to timely do so can't be dismissed as a minor or trivial occurrence. Nor was Chesapeake's failure to the result of impossibility or impracticability. In fact, Chesapeake provides no explanation for its nearly two-year delay in mailing the notice.

Moreover, courts rarely apply equitable doctrines to avoid a forfeiture of a mineral lease, and only in those circumstances in which the lessor's own misconduct has prevented the lessee from complying with the agreement. *See Wilson*, 387 S.E.2d at 811; *McCullough*

---

[4] *Petroleum Reserve Corp. v. Dierksen*, 623 P.2d 602, 604 (Okla. 1981), relied on by the district court, does not suggest otherwise. There, the Supreme Court of Oklahoma excused the lessee's failure to record the declaration of pooling as required by the lease because the property was forcibly pooled by an order of the Oklahoma Corporation Commission, not by any action under the lease agreement.

*Oil, Inc. v. Rezek*, 346 S.E.2d 788, 794 (W. Va. 1986); *Ohio Fuel Oil Co. v. Greenleaf*, 99 S.E. 274, 279–80 (W. Va. 1919). Absent any wrongdoing by the lessor, "the rule that equity abhors a forfeiture is not applicable." *McCullough*, 346 S.E.2d at 795. Here, the Berghoffs didn't prevent Chesapeake from properly pooling the Property. Thus the doctrine of substantial performance is inapplicable and the cases relied upon by the district court readily distinguishable. *See W. Va. Human Rights Comm'n v. Smoot Coal Co.*, 412 S.E.2d 749 (W. Va. 1991) (excusing plaintiff's noncompliance with letter of agreement where employer frustrated those efforts); *E. Oil Co. v. Coulehan*, 64 S.E. 836, 840–41 (W. Va. 1909) (permitting lessee to maintain lease where oil production was obtained just hours after the lease terminated where lessor interfered and lessee worked diligently to obtain production).

Because Chesapeake failed to properly pool the Berghoffs' property prior to the expiration of the primary term, its operations on the William Rodgers South Unit did not extend the lease term.[5]

## III.

John Paul Getty gave three tips for success: "rise early, work hard, strike oil." We would add a fourth: read your contract. The parties' lease in this case set forth the

---

[5] SWN separately argues that it was a bona fide purchaser with no knowledge of this dispute. However, because the district court did not rule on this issue, we decline to address it for the first time on appeal. What defenses, if any, SWN may have are relevant only after the district court has settled the question of liability.

requirements to pool the Property in plain and precise terms, which Chesapeake failed to follow.  And while Mr. Berghoff's refusal to approve the proposed location of the access road may have prevented Chesapeake from continuing its operations on the Property, we cannot say as a matter of law that he acted unreasonably.  We therefore vacate the district court's judgment and remand for further proceedings consistent with this opinion.

*VACATED AND REMANDED*

14