ALZINA IAFOLLA, *etc., et al.*

*v.*

DOUGLAS POCAHONTAS COAL CORPORATION

(No. 14099)

Decided December 12, 1978.

490

*Lewis, Ciccarello, Masinter & Friedberg, Martin J. Glasser* for appellant.

*Richard E. Hardison, Camper & Watson* for appellees.

NEELY, JUSTICE:

The primary question presented by this case is whether the lessors of mineral rights under a lease which provides that the lessee shall either exploit the minerals or pay a minimum rental in lieu of such exploitation may cancel the lease for failure by the lessee to exploit the minerals. We hold that where the parties have agreed to a lease in which the lessee has the option of

either paying a minimum rental or of exploiting the minerals, such lease is valid and enforceable in the absence of fraud, mistake, misrepresentation, or failure of consideration and may not be unilaterally canceled by the lessor. The Circuit Court of McDowell County misapplied the applicable law to the facts of this case and we reverse.

In October 1963, the appellees, Alzina Iafolla, Tony Iafolla, Jr., and Kathleen Iafolla, leased to the appellant, Douglas Pocahontas Coal Corporation, for a period of five years the "deep mining" seams of coal lying under certain parcels of land in McDowell County, West Virginia, constituting approximately 240 acres. This lease, which we shall subsequently denominate the "first lease," included a certain railroad siding along with tippling facilities and related equipment located on the sidetrack. On page nine of the first lease the following provision appears:

> Lessee anticipates that it will begin its mining operation in the Sewell seam on or before January 1, 1964, and in the Fire Creek seam on or before July 30, 1964, but there shall be no duty on it to do so ...

The appellant agreed to pay a rental of fifteen cents (15¢) per ton of coal removed from the Sewell seam, ten cents (10¢) per ton for coal removed from the Fire Creek seam and two cents (2¢) per ton for coal wheelage. It appears that the land covered by this lease was located near other property owned or leased by the appellant coal company and both parties contemplated that the railroad facility would be used for the purpose of loading coal mined on other tracts of land. It is central to our holding in this case that the appellant coal company agreed to pay a minimum rental of twelve hundred dollars ($1,200.00) for each lease year, regardless of whether any coal was mined.

During the term of the first lease, the appellant did not mine or remove any coal from the leased premises and the lease expired by its own terms on 31 December

1968. Approximately three months after the expiration of the first lease, the parties entered into a second agreement which we shall denominate the "second lease" on 10 April 1969, according to which the same premises were leased to the appellant coal company for the term of one (1) year beginning 1 January 1969 and extending until 31 December 1969 upon all the terms and conditions set forth in the first lease, with the following perpetual option:

> Unless Lessee gives notice of cancellation of this lease by October 1, 1969, or the same date of any later year, this lease shall continue in force from year to year until cancelled by the Lessee, at which time this lease shall terminate on the 31st day of December, following date of notice of cancellation.

This second lease was prepared by the attorney for appellees.

The appellant coal company did not begin mining the tracts and by letter dated 24 June 1976, the appellees served notice on the appellant that the lessors were "cancelling" the lease and, thereafter, lessors refused to accept further rental checks. The appellant coal company declined to acknowledge that the lease was terminated and continued to tender rental checks to the appellees, all of which were refused. On 14 October 1976 the appellees instituted suit in the Circuit Court of McDowell County demanding that the lease be declared null and void.

The circuit court determined that: the appellant coal company through its agents had misrepresented to the appellees its intention to mine coal on the leased premises; the lease lacked mutuality since it was perpetual at the option of the appellant; the appellant had abandoned the lease by its failure to mine coal; the lease terms had been breached by appellant's failure to maintain the sidetrack and appurtenances in a usable state of repair; and, therefore, the lease was terminated. We disagree.

## I

The first issue to be considered is whether a lease which provides an option in the lessee to renew the lease indefinitely upon certain terms and conditions will fail for lack of mutuality. The validity of a perpetual lease has most recently been discussed in the case of *Pechenik v. Baltimore & Ohio Railroad Co.*, ____ W. Va. ____, 205 S.E.2d 813 (1974) where this Court held in the syllabus:

> A lease created by a written agreement, based upon a valuable consideration, providing: "... said party of the first part doth hereby demise and lease to the party of the second part, and its assigns, for a period of twenty (20) years from the date hereof, with the right to the party of the second part or its assigns to renew this lease at its option for successive periods of twenty years upon the terms hereof, ..." creates a perpetual lease at the option of the lessee and is not void, nor otherwise unenforceable because the lessee alone is given the option to continue the operation thereof; nor does such lease violate either the rule against perpetuities or the rule of law relating to restraints on alienation.

We went on in the body of the opinion to say that "[w]here the intent of the parties is clear, this Court will not use the vehicle of interpretation to relieve one party of a bad bargain." ____ W. Va. at ____, 205 S.E.2d at 815. The same reasoning applies to the case before us.

In the two leases under consideration (which we may consider for all intents and purposes as one agreement since the language of the first was incorporated by reference into the second) it was obvious that the intention of the parties was that the lessee should have the option either to mine or to pay the twelve hundred dollars ($1,200) minimum rental fee in lieu of mining, and that this opportunity either to mine or pay should continue indefinitely into the future. The parties to the lease were both represented by counsel and the second lease agreement itself was drafted by counsel for the appellees who now seek to be relieved of its burdens. Conse-

quently, there is every reason to hold that the lower court erred by finding that the lease lacked mutuality.

## II

The circuit court found that the appellant, by its failure to exploit the minerals which were the subject of its leasehold, abandoned its rights under the lease and, consequently, the appellees were entitled to relief. There is no case in West Virginia which holds that a lease calling for a minimum rental payment in lieu of exploitation can be abandoned by the lessee as long as the minimum rental payment is regularly paid, with the possible exception of *Wilson v. Reserve Gas Company*, 78 W. Va. 329, 88 S.E. 1075 (1916). Unfortunately the terms of the contract in *Wilson* are inadequately summarized in the opinion, and it appears that the *Wilson* case was decided on the basis of certain explicit provisions in that contract which are no longer readily available for our detailed inspection. Nonetheless, it appears that *Wilson* does not stand for any general legal principle that a lease with a minimum rental can be abandoned by failure to exploit the minerals alone. The Court merely held that under the wording of the lease involved in the *Wilson* case, the option either to drill for gas or to forbear from such drilling extended only for the quarter for which a delay payment was offered and accepted.

Oddly enough, the *Wilson* case, which at first blush might appear to accept the proposition that a lease with delay rentals can be abandoned, actually *held* for the lessee on the grounds that where the delay rental was payable in advance and was in fact paid in advance, there was absolutely no right on the part of the lessee to cancel the lease during the term for which the delay rental had been paid.[1] The Court said:

---

[1] The Wilson case involved a delay rental payment payable only if drilling operations were not begun, while the present case involves a minimum rental payment to insure payment of $1200 per year if an amount of coal sufficient to render lessors royalties totaling $1200 per year is not mined; therefore, two different types of payments are involved, but as this may well be a distinction without a difference, we do not rest our decision on that point.

It bound the lessors to accept, in advance quarterly payments, the cash rental agreed on as compensation for the gas produced and marketed from the first well that yielded gas, until the lessee surrendered or abandoned the lease. It excused drilling operations during any quarter for which such payment was made *and accepted*. It left optional the right to drill or to refrain from drilling within such term as the lessee might elect. 78 W. Va. at 333, 88 S.E. at 1077 (Emphasis added)

The Court then went on to state:

What, then, is the true limitation period of the lease contract, what its duration? It continues in force, by its explicit terms and conditions, without drilling on the land, provided the lessee pays and the lessors accept the compensation fixed by them in lieu of active operations and the production of oil or gas. They excused active development on the land for these products within the quarter for which such payment was made and accepted. The contract plainly so states and shows. Its language could not more definitely express the real intendment of the parties. Such is the plain purport of their solemn engagement. They were competent to bind themselves, and have done so; not irrevocably, not perpetually, but for that quarter. 78 W. Va. at 334, 88 S.E. at 1077.

We conclude that the implication in *Wilson* that the lessor could, indeed, give notice that he would no longer accept the delay rental payments and would expect the lessee either forthwith to exploit the minerals or lose its rights under the lease, was based on an interpretation of the contract in that case. Our inference in this regard is given further weight by the fact that no mention was made in the *Wilson* case of *Lowther Oil Co. v. Guffey*, 52 W. Va. 88, 43 S.E. 101 (1902), an earlier case in which the single syllabus point provided:

Where a grant of oil and gas, and oil and gas privileges, in consideration of one dollar, without

limitation as to time, contains a forfeiture clause in these words; "In case no well is completed within two years from this date, then this grant shall immediately become null and void as to both parties, provided that second party may prevent such forfeiture from year to year by paying to the first annually in advance eighteen and seventy-five one hundredths dollars at her residence until such well is completed," such lease is thereby converted into a lease from year to year *at the option of the lessee* until a well is completed. It would then continue so long as oil or gas is produced in paying quantities. (Emphasis added)

As the Court in *Wilson* neither distinguished nor overruled *Lowther*, we must infer that the decision in *Wilson* was made on the basis of the contract under review in that case rather than on the basis of any change in the common law of landlord and tenant.

The appellees in the case before us rely upon *Bluestone Coal Co. v. Bell*, 38 W. Va. 297, 18 S.E. 493 (1893) which held that a lease of coal, timber, and mineral privileges for ninety-nine years without any delay rental payments implicitly contemplated the exploitation of the minerals within a reasonable time and that in the absence of exploitation within a reasonable time, namely seventeen years, the lessor had the right to presume the contract had been abandoned, and the lessee or his assigns could not restrain the lessor from cutting and using the timber on the land, based on the doctrine of laches. The court further held in *Bluestone Coal* that where the lease had been entered into under a mutual mistake as to the existence of a workable vein of coal and that the timber contract was induced by the belief that such coal existed and the timber could be used in mining the coal, the contract should be rescinded not only with regard to the coal but also with regard to the timber. *Bluestone Coal* while not directly applicable to the case under consideration because there were no minimum rental payments in that case and the period between the date of the original agreement and the date

the action was brought was substantially longer than the period at issue in the case before us, nonetheless stands for the proposition that in any event a reasonable time must be allowed to a lessee. As a condition precedent to the holding in *Bluestone* was that a reasonable period elapse, namely 17 years, we actually find the case in favor of appellant coal company rather than appellees since no reasonable period has elapsed in the case before us.

We do not hold today that in any case in which there is a minimum rental payment there can never be constructive abandonment. Obviously Judge Dent's case of *Lowther Oil Co. v. Guffey, supra,* was written at a time of far more stable currency and the pressures of inflation were not nearly as liable to make a contract entirely equitable and conscionable at the time of its execution rapidly inequitable and unconscionable by virtue of accelerating price distortions. Judge Dent appeared almost to foresee such an eventuality as the rapidly depreciating currency which we are experiencing in our own era when in speaking of the contract under consideration in *Lowther*, he said:

> The manacles were forged by the lessors themselves with their eyes open, and the court cannot remove them unless fraud can be shown *or the contract is so unfair and uneven as to render its enforcement equivalent to the perpetration of fraud upon the lessors.* 52 W. Va. at 91, 43 S.E. at 102. (Emphasis added)

We can envisage a situation in which a contract of this nature might, by virtue of changed circumstances unforeseen by either of the contracting parties[2] become so "unfair and uneven as to render its enforcement equiva-

---

[2] It should be noted that unforeseen circumstances are often a point of negotiation; consequently, it often occurs that the *risk* of unforeseen circumstances is allocated by agreement to one of the parties. This is most likely the case with commercial parties who must attempt to achieve certainty even with regard to the allocation of the risk of uncertainty.

lent to the perpetration of fraud upon the lessors." That is not, however, the situation in the case before us.

Appellees also rely on the cases of *Starn v. Huffman,* 62 W. Va. 422, 59 S.E. 179 (1907) and *Chandler v. French,* 73 W. Va. 658, 81 S.E. 825 (1914) for the proposition that the doctrine of abandonment of mineral leases for non-exploitation is alive and well in West Virginia. We do not contradict that proposition, but an examination of these cases reveals the doctrine's inapplicability to the present case. In *Starn,* the court analogized to lack of consideration since nonexploitation yielded no consideration; in the present case, however, consideration clearly flows from the payment of the minimum royalty. This minimum royalty is also sufficient under the language of *Chandler* which speaks only of total lack of consideration.

> The contract contains no provision for payment of minimum royalties in the event of failure to mine; mining had to be begun before the lessor could demand any of the consideration for the lease. It cannot be conceived, therefore, that the contract was made merely to enable the lessee to speculate wholly for his own profit, or that the lessor intended to incumber [sic] his property for a period of 99 years with a lease from which he might derive no benefit whatsoever until near the end of the term. 73 W. Va. at 661, 81 S.E. at 827.

In the case before us the evidence demonstrates that the coal company was desirous of mining coal and that its delay in exploiting the lessors' property resulted from the depressed market price for coal.[3] Furthermore,

---

[3] The doctrine of abandonment is based on an implied covenant to exploit within a reasonable time; however, an implied covenant will not supercede an express contradictory covenant. On pages 15-16 the lease in the case before us provides:

[T]hat lessee will so mine said coal from said seams or veins in the most diligent, effectual, workmanlike and proper manner so as to ultimately recover the greatest proportion of the *minable and merchantable coal* in each said seam which is practicable ... under all existing conditions. (Emphasis added)

the evidence also conclusively demonstrates that upon receiving notice from the lessors that the lessors intended to repudiate the lease, the lessee coal company immediately offered to renegotiate the entire contract, to lease further seams of coal from the lessors, and to increase the per ton royalty to make the royalties equivalent to the royalties negotiated in similar contracts in the year 1976. Consequently, this Court finds the exact opposite of inequitable conduct on the part of the coal company; rather, we find highly equitable conduct on its behalf and an attempt on the part of the company to conduct business in a fair, reasonable, and profitable way for all parties concerned. Notwithstanding their legal rights to have this contract enforced exactly as written, they went the extra mile in the name of fair dealing and garnered a certain unconscious good will on the part of this Court by their honorable conduct before the institution of any legal action. Consequently we hold that the circuit court erred in holding that the lessee abandoned its interest in the lease.

### III

The circuit court found as a matter of fact that there had been misrepresentation on the part of the lessee at the time the first lease agreement was negotiated. The court found that the lessee led the lessors to rely to their detriment upon the expectation that the lessee would forthwith enter upon the land of the lessors and exploit the minerals.

There is no question that the lease agreement itself fairly implies an intention on the part of both parties

---

The lease further defined minable and merchantable coal as:
[C]oal which, at the time it is reasonably reached in operations hereunder, can then be mined and prepared and shipped and sold by Lessee at a reasonable profit, taking into consideration all existing mining conditions, ... market, economic and labor conditions, and all other factors ...
The only covenant to mine was limited to the mining of "minable and merchantable" coal; therefore appellant's failure to mine due to depressed market prices of coal, which was not contested by appellees, was expressly contemplated under the lease.

that the minerals be exploited; nonetheless, there was an explicit disclaimer in the first lease that although the lessee expected to enter upon exploitation on or about a certain time, it had no obligation to do so. Arguably the disclaimer with regard to lessee's obligation to exploit on a certain day may be read to imply that the disclaimer refers only to the *specific* date, and not a period of years; that interpretation, however, is put entirely to rest by the parties' entering into the second lease agreement, which was executed fully three months after the expiration of the first lease, and well after the lessors were aware that the lessee had not exploited the minerals for a period of five full years.

Ordinarily in West Virginia a written contract is considered to merge all of the negotiations and representations made prior to its execution, and extrinsic evidence is not available to alter or interpret language which is otherwise plain and unambiguous on its face. *Traverse Corp. v. Latimer,* ____ W. Va. ____, 205 S.E.2d 133 (1974); *Nettles v. Imperial Distribs.,* 152 W. Va. 9, 159 S.E.2d 206 (1968). Admittedly the parole evidence rule is one of those legal principles which is difficult to apply in individual cases since fraud, mistake, and misrepresentation are always equitable defenses to the literal enforcement of a written contract. *Wellman v. Tomblin,* 140 W. Va. 342, 84 S.E.2d 617 (1954). Nonetheless the strength of a court's conviction with regard to the applicability of the parole evidence rule to any given contract increases in direct proportion to the degree to which the parties are commercial parties represented by counsel. In the case before us the parties were both commercial parties; they were both doing business in the market economy; neither had either a monopoly or oligopoly position in any line of commerce; and, both were represented by competent counsel. In such a case the parole evidence rule is applicable in its strongest form and a mere allegation by the appellees that they expected more rapid exploitation of their minerals and were reasonably led to believe that such exploitation would be forthcoming, as evidenced only by their own testimony and letters exchanged by

employees of the appellant corporation among themselves, is not sufficient evidence of misrepresentation to vary the plain and unambiguous provisions of the contract which indicates that the lessee may either develop the minerals or pay $1,200 in lieu of mining for as long as it wishes, at its option.

## IV

Finally, the circuit court held that the lessee's failure to keep the railroad siding and appurtenances in a state of good repair violated the express provision of the lease. It is true that the lease agreement provided that while the lessee could completely remove all of the buildings and other facilities on the leased premises with the exception of the railroad sidetrack at its pleasure if necessary for mining, otherwise it would be required to keep the railroad sidetrack and appurtenances in good repair. Nevertheless, the lease also provided explicitly that before the lease would be forfeited, thirty days notice must be given to the lessee of any breach so that the lessee could take corrective measures. It appears from the evidence that the lessee did not keep certain tipple equipment in a state of repair; however, the lessors did not give a conforming notice to the lessee. Rather, the lessors merely gave notice that they were terminating the lease and did not indicate that any corrective measure with regard to the equipment would alleviate their sense of dissatisfaction with the lessee.

We find from the evidence, furthermore, that the equipment was almost entirely useless from the outset of this lease, and that the allegations concerning its lack of repair were extraneous to the real issue in this case and introduced exclusively to justify relief from what appellees came to feel was a bad bargain. Appelles may, of course, give notice conforming to the terms of the lease, and in such notice set forth the specific noncompliance of which they complain. They may then take appropriate action if the lessee declines to take necessary action. On the state of the record before us, however, the court erred in holding that the leasehold was

forfeited for failure to keep the equipment in good repair.

Accordingly, for the reasons set forth above the judgment of the Circuit Court of McDowell County is reversed and the case is remanded with directions that an order be entered for the defendant below.

*Reversed and remanded.*