MIKE ROSS, INC., Plaintiff,

v.

DANTE COAL COMPANY, Defendant.

No. CIV.A. 202CV3.

United States District Court,
N.D. West Virginia.

Sept. 25, 2002.

William R. Wooton, Roslyn C. Payne, Beckley, WV, for Plaintiff.

Richard J. Bolen, Melissa Dodd Veltri, Marvin Capehart, Huddleston, Bolen, Beatty, Porter & Copen, Huntington, WV, for Defendant.

## ORDER GRANTING SUMMARY JUDGMENT TO DANTE COAL COMPANY

KEELEY, Chief Judge.

### I.

### PROCEDURAL HISTORY

This action was originally filed in the Circuit Court of Barbour County, West Virginia, in early 2002 by plaintiff Mike Ross, Inc. ("Ross") against defendant Dante Coal Company ("Dante"). Ross is the successor in interest to S.M. Kaemmerling ("Kaemmerling"), lessor, and Dante is the successor in interest to Badger Coal Company ("Badger"), lessee, under a coal lease originally dated April 25, 1955. In its initial complaint, Ross sought a temporary restraining order as well as preliminary and permanent injunctions requiring Dante to refrain from removing facilities, including a tipple, located on the leased property. In the original petition, Ross alleged that removal of the facilities would violate the terms of the lease, and sought a court order to enforce the lease.

Dante removed the case to this court on January 16, 2002. At a hearing on January 28, 2002, Ross orally asked the Court to enjoin removal of the facilities because the lease had terminated by operation of law following Dante's cessation of mining activities. As a result, Ross contended that Dante had no right to occupy the premises. Because Ross' complaint had not mentioned termination of the lease, the Court gave Ross leave to amend its complaint. Meanwhile, on January 29, 2002, it granted the preliminary injunction sought by Ross.

On February 4, 2002, Ross filed an amended complaint. In Count I, it sought an injunction to prohibit Dante's removal of the facilities based on its original theory that removal would violate the lease. Similarly, in Count II, it alleged that removal of the facilities directly contravened certain express terms of the lease. In Count III, however, Ross sought a declaration that the lease was void and unenforceable on the ground that Dante's cessation of mining operations had caused the lease to terminate automatically. Dante timely answered the amended complaint.

Thereafter, on February 28, 2002, the parties submitted an Agreed Order that dissolved the preliminary injunction, permitted Dante's removal of the facilities, dismissed the DEP from the action and withdrew Counts I and II of the amended complaint. The remaining count in Ross' complaint seeks a declaratory judgment regarding the rights and obligations of the parties, especially with regard to Dante's obligation to mine all merchantable coal on the property.

During a telephone conference with the Court on April 1, 2002, the parties agreed that the sole remaining issue in this case is primarily a legal question. Both parties then filed motions for summary judgment with supporting memoranda of law, and the case is now ripe for the Court's consideration.

### II.

### STATEMENT OF FACTS

The coal reserves in this case are the subject matter of the April 25, 1955 lease

agreement between Kaemmerling and Badger, and of certain later amendments to that lease. According to the testimony of Senator Mike Ross, the owner of the plaintiff corporation, Ross is the successor in interest to the lessor and Dante is the successor in interest to the lessee.

The 1955 lease provides, in relevant part, that the lease shall continue "until all of the mineable and marketable coal that can be removed from the premises by the use of efficient, practical and modern methods of mining is exhausted, unless sooner terminated as hereinafter provided." In addition, it provides that the "Lessee shall work, mine and recover all the mineable and merchantable coal in the premises in an efficient and workmanlike manner and according to the approved methods of modern mining." The lease also provides that "a waiver by Lessor of, or failure to enforce, any particular cause of forfeiture shall not prevent the forfeiture and cancellation of this lease for any other cause of forfeiture, or for the same cause occurring at any other time."

The June 30, 1966 supplemental lease between Kaemmerling's successor in title, R.K. Bogert, Jr. and others ("Bogert"), and Badger, the January 31, 1967 royalty agreement between Bogert and Badger, and the March 1, 1967 lease agreement between Bogert and Badger provided for the lease of additional lands "to have and to hold" under the same terms and conditions as provided for in the original lease. The February 6, 1993 deed shows that Bogert conveyed all of his interest in the lease to Ross.

Dante admits that the leased property has not been mined for more than fifteen years, and Ross has no record of any mining on the property since 1984. Dante admits that there are currently no active mining operations, and has stated that the property cannot be operated profitably at the present time.

Ross asserts that this failure to mine leaves at least one hundred forty-four million tons of coal on the leased premises which Dante has identified as "economical to mine" but has not recovered. It further states that, since the cessation of mining operations, the selling price for coal produced adjacent to or near the leased premises ranged from $15.00 to $30.00 per ton. Senator Ross testified at the hearing that the price per ton is currently higher than that. Ross argues that, if the coal were mined today, it could potentially receive millions of dollars in royalties on the leased premises rather than the "appallingly low royalty rate" of ten cents per ton.

According to Dante, however, review of certain additional facts that were known to Ross at the time of the purchase in 1993, as well as facts that have occurred since that time, is necessary to completely understand the equities of the case. Dante claims these facts show that the royalty rate is not "appallingly low," as Ross claims, but rather is a substantial rate under the circumstances.

First, Dante argues that Ross knew it was purchasing a long-term lease with a low royalty rate, and used this fact to its advantage in negotiating a very favorable purchase price. Dante notes that the purchase price of $300,000 is equal to 2/10 of one cent per ton of coal, much less than the royalty payment. Moreover, it claims Ross knew or should have known that it was buying high sulfur coal, which has a limited market. Dante further posits that Ross must have known that coal production had been steadily declining in northern West Virginia for a number of years, that there were few active coal operations in Barbour County, and that there had been no mining on the leased premises since 1984.

Furthermore, contrary to Ross' assertions, Dante counters that it has not physically abandoned the property and has no intention to do so. It points to its continued physical possession and control of the premises, including maintenance of an office and employment of at least one full-time employee on the premises. Dante also argues that it has paid all maintenance costs, maintained the necessary permits, and remains prepared to re-commence operations in the event that market conditions permit it to conduct mining operations profitably. Additionally, it has investigated all reasonable options for developing the coal reserves, including drilling core holes and investigating the possibility of subleasing or selling the lease. Dante argues that these costs provide financial incentive for it to develop the coal, but that it is simply not economically feasible at this time for it to do so. Finally, Dante points out that there are many ten cents per ton leases still in effect in the coal fields of West Virginia, which underscores the point that this royalty rate is neither unusual nor "appallingly low."

## III.

### STANDARD OF REVIEW

Summary judgment is appropriate when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Material questions of fact are limited to those whose outcome is determinative of the substantive legal issue in question. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). An issue is genuine when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The moving party bears the initial burden of identifying "those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affi-

davits, if any' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 56(c)). The burden then shifts to the respondent, who may not rest on the pleadings, but must point to specific facts showing that there is a genuine triable issue. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505; *Kitchen v. Upshaw,* 286 F.3d 179, 182 (4th Cir.2002).

### IV.

### ANALYSIS

### A.

### *The Applicability of Oil and Gas Case Law to a Coal Case*

To analyze this case, the Court first must determine whether Ross is correct that case law regarding oil and gas leases applies to a case involving a coal lease. In its argument, Ross relies almost exclusively on the authority in oil and gas cases, which Dante insists is inapplicable for several reasons.

First, Dante claims that the jurisprudence of oil and gas is almost entirely separate from that of coal in West Virginia. It notes that the leading oil and gas case relied upon by Ross, *McCullough Oil v. Rezek,* 176 W.Va. 638, 346 S.E.2d 788 (W.Va.1986), although frequently cited in other oil and gas cases, is never cited in a coal case. Second, Dante points out that, in both form and content, oil and gas leases are very different from coal leases. Typically, oil and gas leases contain habendum clauses that provide the lease shall remain in effect so long as production continues. Coal leases, on the other hand, rarely contain such clauses, providing instead that the lease shall remain in effect until all of the mineable and merchantable

coal has been exhausted.[1] Also, oil and gas leases rarely contain a provision requiring payment of minimum royalties or rental payments. However, coal leases often provide for minimum royalties or rentals.

In addition, Dante documents the differences in oil and gas and coal production. Oil and gas production is ordinarily continuous, sometimes lasting for many consecutive years. Coal production, by contrast, is rarely continuous, and sometimes involves pauses lasting several years. One reason for this is that oil and gas is fugacious, and can be lost to surrounding property if not diligently captured. Coal, of course, remains in the ground until removed, and mining companies often delay mining or marketing until doing so is profitable.

In reply to all this, Ross claims that oil and gas cases have been cited in coal cases, noting in particular *Iafolla v. Douglas Pocahontas Coal Corp.*, 162 W.Va. 489, 250 S.E.2d 128 (1978), a case on which Dante relies heavily. Ross points out that even *Iafolla* cites at length the oil and gas lease case of *Wilson v. Reserve Gas Co.*, 78 W.Va. 329, 88 S.E. 1075 (1916), and that *Iafolla* also distinguished the case of *Chandler v. French*, 73 W.Va. 658, 81 S.E. 825 (1914). In *Chandler*, the West Virginia Supreme Court noted that the doctrine of abandonment of mineral leases for non-exploitation is alive and well in West Virginia, but found the doctrine inapplicable to the case:

> In respect to the lessee's duty to develop there is no distinction between an oil and gas lease and a coal lease. The difference in the nature of the minerals, with respect to which the right is given, furnishes no basis for applying to the two kinds of leases different rules of construction. That the existence of one is known and the other unknown is no reason why the lessee should not be diligent to develop in the one case as in the other.

81 S.E. at 828.

The facts in *Chandler* are substantially different from those in the present case. There, the lease contained no provision for the payment of minimum royalty or rental payments, and the lessee did not pay property taxes. These facts demonstrate a lease more typical of an oil and gas lease, and significantly different from the usual coal lease. Moreover, in *Chandler*, the only consideration for the lease was in the form of a royalty measured by the amount of mineral produced. Despite these important differences, Ross insists that the case strongly supports its position that cases involving oil and gas leases are applicable to cases involving coal leases.

To settle this dispute, the Court need not draw a sweeping conclusion that all oil and gas cases either apply or do not apply to all coal cases. A more reasonable approach is to consider the factual background of each case. If the facts of a particular oil and gas case are similar to those of a coal case, the case's analysis may assist a court in a coal case. On the other hand, if there are important factual differences between the oil and gas and coal cases, such as the presence or absence of an habendum clause or a provision for minimum royalty payments, the oil and gas case would be of little assistance in

---

1. The lease agreement in this case contains a clause providing that the term would "continue until December 31, 1973, and thereafter until all of the mineable and marketable coal that can be removed from the premises by use of efficient, practical and modern methods of mining is exhausted, unless sooner terminated as hereinafter provided...." This clause is present in the original lease, signed in 1955, and had remained unchanged despite subsequent amendments to the lease in June of 1966 and January of 1967.

deciding a coal case. Because such important factual differences typically exist, oil and gas cases normally are not very helpful in analyzing coal cases. However, some coal cases have cited to oil and gas cases, and there is no reason why, in reviewing this coal case, this Court should refuse to consider an oil and gas case if the material facts are similar.

This determination does not help Ross much, however, because most of the oil and gas cases on which it relies do not have minimum royalty or rental payment provisions, or provisions requiring continuous production. Still, in the remaining analysis, the Court will discuss several of the cases on which Ross relies to illustrate the significance of the factual differences to the legal analysis here.

B.

*Whether the Lease was Terminated Through Forfeiture or Abandonment*

■ The major question in this case is whether the lease between Ross and Dante has terminated due to abandonment or forfeiture. To make that determination, it is necessary to determine whether Dante had any express or implied duty to mine.

Dante did not have any express duty either to mine continuously or to act with reasonable diligence. The coal lease did not contain an habendum clause providing that the lease would remain in effect so long as production continued. Rather, it contained a term clause providing that the lease would remain in effect until the supply of mineable and merchantable coal was exhausted. Unlike in many coal leases, the lease did not contain any clause requiring Dante to act with reasonable diligence. Therefore, Dante's cessation of production did not violate any express lease provision.

Dante also had no implied duty to mine. The lease agreement provided for annual minimum royalty payments. This provi-

sion suggests that the parties anticipated there might not be continuous mining. Courts have generally imposed an implied duty to act with reasonable diligence only when there is no provision requiring payment of minimum royalties or rentals. This makes sense because minimum royalties or rental payments are designed to ensure that the lessor receives a return on its investment regardless of whether there is actual production, and also to protect the lessee in case production becomes temporarily impossible or unprofitable.

Minimum royalties or rentals serve as a substitute for a due diligence provision and extend the lease despite periods of low production or non-production. *See Iafolla*, 162 W.Va. at 490, 250 S.E.2d 128 (syllabus point 2)(absent extraordinary circumstances, lease providing for minimum rental payment could not be considered abandoned during its term for failure to exploit minerals so long as minimum rental payments were regularly tendered); *Goodwin v. Wright*, 163 W.Va. 264, 255 S.E.2d 924 (W.Va.1979) (lease was terminated because lessee failed to produce and did not pay royalties or rentals to keep the lease in effect); *Begley v. Peabody Coal Co.*, 978 F.Supp. 861 (S.D. Indiana 1997) (although the implied obligation of diligent mining has been widely recognized by courts, it is a narrow principle, and it does not apply when the parties to the lease provide for some substantial amount of advance royalties or other assurance of income to the lessor in the event the lessee does not mine at all; *Dulin v. West*, 35 Colo.App. 6, 528 P.2d 411 (Colo.1974) (where minimum royalties and annual rentals provided for in lease are reasonably substantial in relation to anticipated return from the property, they are in effect an agreed compensation to the lessor for the lessee's failure to achieve reasonable production); *Archer v. Mountain Fuel Supply Co.*, 102 Idaho 852, 642 P.2d 943 (Idaho 1982) (courts have not

imposed an implied-in-law obligation to mine, separate and apart from the language of an agreement, where substantial consideration was paid in exchange for a mining lease). These cases suggest that, where there is no lease requirement of continuous production or due diligence, and where minimum royalty payments are made as required by the lease, there has been no forfeiture or abandonment through non-production.

*Christian Land Corp. v. C. & C. Co.*, 188 W.Va. 26, 422 S.E.2d 503 (W.Va.1992)(per curiam), is the only West Virginia case finding abandonment of the coal lease despite the presence of a minimum rental payment provision. The facts of that case, however, are quite unlike those in the instant case. The lessee coal company in *Christian* had its mining permits revoked and was in bankruptcy proceedings. 422 S.E.2d at 505. Under the bankruptcy court's order, the coal company had no continuing obligation to make lease payments or maintain any West Virginia interest in the property. *Id.* In the context of these facts, the West Virginia Supreme Court of Appeals concluded that the coal company's loss of its mining rights, and its failure to even attempt to regain those rights, constituted abandonment of the lease. *Id.* at 507–08.

Here, by contrast, Dante has continued its payments as due under the lease, and there is no indication that it will cease doing so. Moreover, Dante's permits have not been revoked, although they are in inactive status.

■ Abandonment requires both physical abandonment and an intent to abandon, *Christian Land Corporation v. C. & C. Company*, 188 W.Va. 26, 422 S.E.2d 503 (W.Va.1992), and depends on the particular circumstances of each case. *Id.* Here, Dante has continued to maintain the property and has paid a maintenance crew. It has drilled test holes and explored the possibilities of subleasing or selling its interest. It has paid property tax reimbursements and minimum annual royalty payments to Ross, and kept all permits active so it could begin to mine if doing so became plausible. These actions clearly indicate that Dante had no intention to abandon, and did not physically abandon, the property. Thus, the Court concludes it has not abandoned the lease. Because there has been no abandonment or forfeiture of the lease, the lease remains in effect and Dante retains its rights under the lease to be on the property.

### C.

*Whether Reformation of the Lease Agreement is Appropriate*

■ Ross asserts that, if the lease has not terminated, it should be reformed because it is inequitable or unconscionable to enforce a lease with such an "appallingly low" minimum royalty rate. Dante argues that, when all of the facts of the case are considered together, the royalty rate is not "appallingly low," but, rather, is exactly what Ross bargained for. It appears that, at the time of the sale, both Ross and Bogert knew the coal was subject to a long-term lease with a low royalty rate. It follows that this necessarily helped Ross obtain a favorable purchase price. Also, Ross was aware that there was a limited coal market in the area, particularly for the high-sulfur coal reserved in the lease, and knew that there had been no production on the premises for many years. In light of these facts, the minimum royalty payment is not appallingly low. It is what was bargained for, and is a reasonably substantial return on the investment, particularly when one considers that Ross does not bear the cost of maintenance or taxes.

In addition to these basic equitable considerations, Dante correctly points out that

reformation is only a remedy in West Virginia for mutual mistake of fact. Because there is no evidence that there was mutual mistake of fact, or even mistake of one party, in negotiating the original lease or subsequent transfers of the interests, there is no legal or equitable basis for reforming the lease agreement in this case.

In its brief, Dante also argues that Ross has waived his right to contest the validity of the lease agreement by operation of the doctrine estoppel. In light of the Court's ruling that the lease agreement was not terminated through forfeiture or abandonment, and that the agreement should not be reformed, it need not address this issue.

### D.

*Whether the Doctrine of Reasonable Expectations Applies to this Case.*

■ ▪ To protect its interests, Ross urges the Court to engraft the doctrine of reasonable expectations onto the case law of coal leases. Even if this doctrine were applicable, however, it would be of no help to Ross in the present case.

■ The doctrine of reasonable expectations is primarily a doctrine of insurance law. In an insurance context, the doctrine states that the objectively reasonable expectations of applicants and intended beneficiaries regarding the terms of insurance contracts will be honored, even though painstaking study of the policy provisions would have negated those expectations. *McMahon & Sons, Inc.*, 356 S.E.2d at 495. In other words, where the insured has a reasonable expectation of coverage under a policy, the insured should not be subject to technical encumbrances or hidden pitfalls.

■ Before the doctrine of reasonable expectations is applicable to an insurance

contract, however, there must be an ambiguity regarding the terms of that contract. *Nat'l Mut. Ins. Co. v. McMahon & Sons, Inc.* 177 W.Va. 734, 741, 356 S.E.2d 488, 496 (W.Va.1987)(citing *Soliva v. Shand, Morahan & Co.*, 176 W.Va. 430, 345 S.E.2d 33, 35–36 (1986)). The requirement of ambiguity is based on the fact that the doctrine is essentially a rule of construction, and unambiguous contracts do not require construction by the courts. Thus, even if the doctrine generally applied in coal lease cases, something no West Virginia court has held, it would not apply to the present case because the lease agreement is unambiguous.[2]

### V.

### CONCLUSION

Ross' claim against Dante fails because there is no express or implied duty on the part of Dante to mine continuously or to operate with due diligence. The minimum annual royalty payment has maintained the lease in effect despite Dante's period of non-production. Thus, Dante has not forfeited its rights under the lease due to its failure to produce. In addition, it neither physically abandoned nor intended to abandon the property, so the lease was not terminated through abandonment. Furthermore, there are no legal or equitable grounds for reformation of the lease agreement. Finally, the doctrine of reasonable expectations is inapplicable to the present case. Accordingly, the lease agreement remains in full effect. For the reasons stated, the Court DENIES Ross' motion for Summary Judgment and GRANTS Dante Coal's motion for Summary Judgment. The Court enters JUDGMENT for the defendant, Dante Coal Company, and DISMISSES the case with prejudice.

---

**2.** And even if the contract were ambiguous and the doctrine did apply, it still would not help Ross because any expectations of continuous production or higher royalty rates which Ross might have had were unreasonable in light of all the circumstances of this case.

It is so ORDERED.

The Clerk is directed to transmit copies of this Order to counsel of record herein.