No. 20-0965 - *Antero Resources Corp v. Directional One Services Inc USA*

Walker, J., dissenting, joined by Armstead, J.

In affirming the decision of the circuit court in this case, the majority has reached the wrong result. While well-intended, the majority appears to divine the parties' reasonable expectations and then rewrite the contract between them. Because our law provides that commercial parties are free to contract as they see fit (absent contravention of law or public policy), and courts are to enforce those agreements as written, I respectfully dissent. And Justice Armstead joins me in this dissent.

Antero contracted for Directional One to provide drilling services for its wells. At the outset of their relationship, Directional One presented Antero with a Directional Drilling Proposal (Proposal) that contained a "per day" rate schedule for drilling services, among other things. A short time later, the parties entered a "Master Services Agreement" (MSA) that controlled their relationship and incorporated the rate schedule for pricing. The Proposal and MSA contained conflicting terms regarding liability, but the MSA expressly superseded the Proposal's conflicting terms, regardless of the sequential order of the documents, and placed the risk of lost equipment on Directional One. But when Antero refused invoices for lost equipment, Directional One sued claiming that the Proposal's conflicting terms governed.

Directional One delivered the Proposal on August 25, 2014, and Antero signed it on September 19, 2014. The Proposal consisted of three sections titled

1

"Operational Day Rate" (Rate Schedule), "Replacement / Lost in Hole Prices" (LIH Pricing Section), and "General Terms and Conditions" (Contract Terms).[1] The Rate Schedule included over forty itemized costs that Directional One either included in per day drilling rates or that Antero could choose to add on. The costs ranged from daily drilling equipment and supervision to hotel accommodations for Directional One personnel. The LIH Pricing Section provided lump sum costs to replace lost drilling equipment. And the Contract Terms purported to govern the parties' relationship and said, among other things, "[i]n the event any of [Directional One's] down-hole equipment is damaged or lost in the well, [Antero] shall either recover same without cost to [Directional One] or pay for any damage or loss of such equipment." The Contract Terms also included an option for Antero to purchase "Liability Reduction" insurance but provided no pricing information for it. And the Rate Schedule did not include it as a per day cost or add-on option. Indeed, under the Contract Terms, Antero needed to enter a separate agreement to purchase the Liability Reduction insurance.[2]

---

[1] The parties adopted an updated version of the Proposal on January 1, 2015, to reflect rate changes after Directional One "initiated both internal as well as external cost competitive exercises." They adopted another updated version on March 31, 2018, to "include[] an increase in the operational price . . . . strictly due to supply chain costs." The two updated versions contained the same three sections as the first Proposal.

[2] The Contract Terms state that "Liability Reduction coverage will be honored only if a Liability Reduction agreement has been executed . . . ."

Antero and Directional One entered the MSA on August 29, 2014, and entered an identical version of it on September 30, 2015. The MSA contained clauses that said it "shall control and govern the relationship of the [p]arties" and

> *[i]f there are any conflicts* between the provisions of this Agreement and any Order, Contractor's work ticket, invoice, statement, published rate schedule, or any other type of document . . . *the provisions of this Agreement shall control* to *the extent of the conflict*, regardless of the relative dates of any documents . . . .[3]

As to risk of loss, the MSA said

> [Directional One's] . . . agreement to perform Work means that [it] has . . . incorporated into the compensation . . . .(ii) the complications, hazards, and risks incident to the Site and/or performing the Work . . . .
>
> . . . .
>
> [T]he rates agreed to be paid to [Directional One] by [Antero] shall be inclusive of (i) insurance premiums paid by [Directional One] in acquiring and maintaining the insurance required by this Agreement . . . .
>
> . . . .
>
> [Directional One] shall release, protect, defend, indemnify, and hold harmless [Antero] from and against any and all Claims arising out of or related to . . . (ii) the damage to or loss of property of [Directional One] . . . .
>
> . . . .
>
> [Directional One] . . . shall at its own cost and expense . . . carry insurance . . . in accordance with the specifications and requirements set forth in this Article 14 and Exhibit "A" of this Agreement.

---

[3] Emphasis added.

3

Exhibit A required Directional One to carry first party property insurance "covering (for its full value) the property, equipment, tools, and equipment of [Directional One] that is used in the Work."[4]

Importantly, the MSA incorporated Directional One's Rate Schedule by stating "[Antero] will pay [Directional One] . . . in accordance with [Directional One's] published schedule of rates and/or prices . . . ."

Despite the MSA expressly controlling over conflicting terms in the "published rate schedule, or any other type of document," the majority reads the Proposal's conflicting terms as somehow qualifying the MSA. We agree the Court must read the Proposal with the MSA to the extent that the MSA incorporated the Proposal for its published schedule of rates. But when reading the documents together, we cannot read out the MSA's conflict provision. In its effort to harmonize the conflicting terms, the majority adopts Directional One's ad hoc name for the Proposal by calling it "the rate sheet." The name certainly bolsters the argument for incorporating the Proposal's conflicting terms into the MSA since the MSA incorporated Directional One's "published schedule of rates and/or prices." But the name is misleading because only one section of the Proposal

_____

[4] Parentheses in original.

4

provided the published rates; the other sections conflict with the MSA and attempted to govern aspects of the parties' relationship that the MSA controlled.

Because the LIH Pricing Section of the Proposal provided lump sum pricing for lost equipment, it conflicts with the MSA's provisions that required Directional One to incorporate the risks incident to the drilling into its compensation, indemnify Antero against property loss, and insure its own equipment. Likewise, the Proposal's Contract Terms that attempted to shift the risk of loss to Antero and offered Antero the option to purchase Liability Reduction insurance conflict with the same provisions. So, under the plain terms of the MSA's conflict provision, the MSA controlled the conflicts and could not have incorporated the Proposal's LIH Pricing Section or the conflicting Contract Terms. And Antero correctly argues that "the MSA clearly indicates the provision of only a list or schedule of prices and does not refer to any document intended to include additional terms and conditions."

The majority finds that the MSA incorporated the entire Proposal because "if Antero's claim is correct that the rate sheets are effective only to the extent that they contain raw pricing numbers, then the conflict provision would again be meaningless because raw numbers could never conflict with the MSA, which contains no pricing information at all." But the MSA provided pricing information by incorporating the Rate Schedule. And the conflict provision undoubtedly retained meaning because it contemplated conflicting terms accompanying published rate schedules and expressly superseded them. In this instance,

5

the LIH Pricing Section and Contract Terms accompanied the Rate Schedule in the same document, but the MSA's conflict provision permitted the MSA to incorporate only the Rate Schedule. The MSA's and Proposal's relative effective dates do not matter because both parties entered the MSA knowing that it governed conflicts "regardless of the relative dates of any documents." While Directional One may have wished for the MSA to incorporate the Proposal's sections accompanying the Rate Schedule, "[i]t is the duty of the [C]ourt to construe contracts as they are made by the parties thereto and to give full force and effect to the language used, when it is clear, plain, simple and unambiguous."[5]

What's more, the majority finds the MSA unambiguous yet interprets it using extrinsic evidence like industry customs, how "Antero acted as though the [MSA] and the [Proposal] were interrelated[,]" the record's reflection of Antero's understanding, and the parties' course of performance. But "in the absence of fraud, mistake, or material misrepresentations extrinsic evidence cannot be used to alter or interpret language in a written contract which is otherwise plain and unambiguous on its face."[6] So, we should not look outside the four corners of the unambiguous MSA to interpret it; by its plain terms,

---

[5] *Rollyson v. Jordan*, 205 W. Va. 368, 376, 518 S.E.2d 372, 380 (1999).

[6] Syl. Pt. 3, in part, *Iafolla v. Douglas Pocahontas Coal Corp.*, 162 W. Va. 489, 250 S.E.2d 128 (1978); *see also* Syl. Pt. 1, *Buckhannon Sales Co., Inc. v. Appalantic Corp.*, 175 W.Va. 742, 338 S.E.2d 222 (1985) ("where the meaning [of a contract] is uncertain and ambiguous, parole evidence is admissible . . . ."); *see also Addicks Serv., Inc. v. GGP, Bridgeland, LP*, 596 F.3d 286 (5th Cir. 2010) ("Parole evidence—such as the parties' course of performance—may be used to ascertain the intent of the parties only if the contract is first found to be ambiguous.").

it incorporated only the Rate Schedule from the Proposal and required Directional to build the risk of loss into the per day rates, indemnify Antero against property loss, and insure its own equipment.[7]

Also, the majority finds "no error in the circuit court's conclusion that Directional One was permitted by the MSA to seek compensation for both lost tools and equipment in addition to its labor and expertise." The circuit court reached the conclusion based on Section 10.1 of the MSA which says

> [Antero] will pay [Directional One] for Work that is satisfactorily rendered and in accordance with this Agreement . . . at such rates and/or prices . . . in accordance with [Directional One's] published schedule of rates and/or prices . . . .

The MSA defines "Work" as "any and all services, labor, experience, expertise, vehicles, equipment, supplies, tools [etc.] . . . to be provided . . . pursuant to this Agreement . . . ." Specifically, the circuit court found "the plain language of [the definition of Work] and 10.1 of the MSA require [Antero] to pay for 'work,' which includes tools and equipment 'provided' to [Antero] in accordance with the 'published' Rate Sheets." Following this reasoning, the circuit court found that Section 10.1 required Antero to pay Directional the

---

[7] Specifically, the majority interprets the MSA including evidence that Antero paid Directional One for lost or damaged drilling equipment and paid invoices for the equipment's insurance on prior occasions. While we should not consider parties' course of performance or other extrinsic evidence to interpret unambiguous contracts, the course of performance could prove a waiver of express contract terms. But in this instance, the MSA contracted against such waivers by providing "Payment by [Antero] of any invoice . . . shall be without prejudice and shall not constitute a waiver of [Antero's] right subsequently to question or to contest the correctness of said invoice . . . ."

7

price of the drills listed in the LIH Pricing Section. But Section 10.1 does not say that Antero would pay for Work provided; it says that Antero would pay for Work "satisfactorily rendered." As the majority correctly found, Antero hired Directional One for its "labor, expertise, tools, and equipment"—not to sell them drills. Giving Section 10.1 its fair meaning, it contemplated payment for drilling services satisfactorily rendered, not for the purchase of drills satisfactorily rendered. So, the circuit court erroneously found that Section 10.1 required Antero to pay for the lost drills as "tools and equipment 'provided.'"[8]

To allow Directional One to escape its bargain, the majority reads out the MSA's conflict provision and considers parole evidence to interpret an unambiguous agreement. The MSA required Directional One to incorporate the risk of loss into its per day rates, indemnify Antero against property loss, and insure its own equipment. And the circuit court erred by finding that Section 10.1 of the MSA required Antero to pay for the drills. For those reasons, we would reverse the circuit court's grant of summary judgment.

---

[8] Even following the circuit court's erroneous reading of Section 10.1 and the definition of Work, it erred by granting summary judgment since an issue of fact would remain as to whether Directional One satisfactorily rendered the drills when they became lodged in the wells.