No. 24-ICA-340 – *Ameriprise Financial, Inc. v. Charles E. Vallandingham*

**FILED**

**June 12, 2025**

ASHLEY N. DEEM, CHIEF DEPUTY CLERK
INTERMEDIATE COURT OF APPEALS
OF WEST VIRGINIA

WHITE, Judge, dissenting:

It has long been a fundamental principle of the law that "[a] rogue cannot protect himself from liability for his fraud by inserting a printed clause in his contract." *Ernst Iron Works v. Duralith Corp.*, 200 N.E. 683, 684 (N.Y. 1936). The majority opinion dispenses with this principle and creates a new one, holding that a boilerplate clause slipped into a contract of adhesion can absolve the contract's drafter of liability for any and all fraud. This new principle of law – giving conclusive legal effect to "non-reliance" contract clauses – was not briefed by the parties. Instead, it was created to reach the majority's preferred result. However, the SCAWV has said that when "one person induces another to enter into a contract by false representations," a tort action lies for damages. Syl. Pt. 1, *Horton v. Tyree*, 104 W. Va. 238, 139 S.E. 737 (1927).[1] I respectfully dissent because the majority opinion creates new law that is contrary to the policy stated by the SCAWV in *Horton*.

---

[1] The SCAWV has noted "fraud is infinite." *Holt v. King*, 54 W. Va. 441, 47 S.E. 362, 365 (1903). Another court likewise said that "[f]raud is infinite in variety. The fertility of man's invention in devising new schemes of fraud is so great, that the courts have always declined to define it . . . All surprise, trick, cunning, dissembling and other unfair way that is used to cheat anyone is considered as fraud." *Kugler v. Koscot Interplanetary, Inc.*, 293 A.2d 682, 691 (N.J. Super. 1972).

1

1. *Half-truths are actionable misrepresentations*

To understand the flaws in the principle of law adopted in the majority opinion, one must see the facts and legal theory upon which the circuit court based its judgment in favor of the plaintiff. The majority opinion undermines the circuit court's finding of fraud without explaining either its breadth or basis. In so doing, the majority avoided discussing the long-standing concept of the "half-truth," which essentially provides that a half-truthful statement is as misleading as a statement that is completely false, and, as such, is actionable as a fraud or misrepresentation. Once a person chooses to speak, they must speak truthfully and disclose the whole truth.

Here, the plaintiff, Charles Vallandingham, is an "independent advisor" with a franchise from defendant Ameriprise. Ameriprise's franchise agreement requires advisors to create new business every year. Throughout 2007, another Ameriprise advisor, Kenneth Beck, failed to generate that new business. Accordingly, in February 2008, Ameriprise told Beck he was in default of his franchise agreement and had until the end of 2008 to cure. Beck failed to cure his default.

On January 7, 2009, Ameriprise told Beck it had terminated his franchise. What the majority opinion omits is that Beck was also told he had 90 days to sell his practice; if he failed to do so, Ameriprise would assume control of Beck's clients and Beck would receive nothing from Ameriprise. This fact is central to Vallandingham's trial

strategy, because it shows Ameriprise's motivation behind its later misrepresentation: either that another Ameriprise advisor had to buy the practice from Beck, or Ameriprise would assume the practice and all of the problems buried therein.

The majority opinion does not mention that Ameriprise had viewed Beck as a problematic advisor as early as 2004. For example, that year, Ameriprise discovered Beck had sold an improper annuity to a client to generate quick, upfront fees for himself. Ameriprise reversed the transaction and fined Beck $847, but it failed to report Beck to FINRA even though the transaction clearly violated FINRA rules. In another 2004 case, Beck sold a client an unsuitable financial product that generated high commissions for himself but endangered the client's investment; Ameriprise found that transaction also violated various rules and fined Beck $1,500. The record over the years goes on: Beck took cash out of a client's account and bought high-commission annuities without the client's permission; Ameriprise fined him $2,000 for that conduct but failed to report it to FINRA. Beck also convinced an elderly client to buy a $125,000 insurance policy and to pay the premiums (for which Beck got a commission) using money from the client's IRA; the IRA withdrawals generated tax penalties, such that the client's out-of-pocket expenses were near $200,000 for the $125,000 policy. Beck swindled a client, who was elderly and had Stage IV cancer, into buying an annuity that secured hefty fees for Beck but locked up the client's money so that it could not be withdrawn without severe penalties. Beck convinced other clients to buy insurance policies secured with stock market assets, but when the stock market collapsed in 2008, the value of the policies dropped to zero. Still, because Beck was

3

receiving commissions on those policies, he did not tell those clients their policies were worthless and got them to keep paying premiums.

Ameriprise monitors its advisors to ensure that they are following company, state, federal, and FINRA regulations. Ameriprise built a "compliance file" on Beck that includes the investigation findings, complaints, reprimands, and fines against Beck during the five years prior to its terminating his franchise. The compliance file shows that, after sending Beck his notice of default in February 2008, Ameriprise found Beck was ignoring attempts at oversight. Ameriprise escalated its "surveillance" of Beck and discovered his investments for clients were problematic. For instance, Ameriprise found "definite forgeries" by Beck of his clients' signatures on investment documents. These forgeries were required to be reported to FINRA; however, Ameriprise made no report.

Importantly, Ameriprise's compliance file notes that the executive in charge of supervising Beck, William C. Cupach, was aware of many of Beck's issues. For example, the record shows that if a financial advisor "has forged a signature," Cupach would "immediately get a phone call." Cupach worked with other Ameriprise employees in phone calls discussing Beck's failure to follow corporate oversight policies. One document in Beck's file shows those Cupach phone calls resulted in Ameriprise levying a $500 fine against Beck in December 2008. Cupach later testified that Beck's franchise could have been terminated for any of the numerous issues listed above. However, as the

majority opinion recites, Cupach further testified that Beck's franchise was terminated solely due to his failure to meet the franchise agreement quota of new business.

Plaintiff Vallandingham had no idea Ameriprise had a thick compliance file on Beck, but he quickly learned in early 2009 that Beck lost his franchise for failing to produce new business, and that he was trying to sell his practice. Testimony at trial showed that the typical way an Ameriprise independent advisor grows his or her business is by buying the practice of departing advisors. By 2008, Vallandingham had about 208 clients. Beck had roughly 201 clients doing $13 million in business through Ameriprise. Vallandingham offered Beck $75,000,[2] and shortly thereafter, Beck spoke with Vallandingham and showed him a few general documents regarding his practice.

After speaking with Beck, Vallandingham called Cupach, the Ameriprise executive in charge of his region. First, Vallandingham asked Cupach if Beck was "really" being terminated for not creating new business. Cupach confirmed that was the reason. Vallandingham then asked Cupach: "Is there anything else I need to know regarding this

---

[2] Beck was earning $100,000 a year from his practice, so paying three-quarters that amount seemed like a good deal to Vallandingham. However, after Vallandingham assumed control of Beck's clients, and revealed to many of them their investments were worthless, the clients left. Vallandingham estimated three-fourths of Beck's 201 clients abandoned him and Ameriprise, largely because of Beck's improper financial advice.

5

transaction?" Cupach replied, "No." Cupach does not deny this comment. That comment is the linchpin of the plaintiff's fraud case against Ameriprise.

Standing alone, Cupach's "no" might look like a thin reed to hang a million-dollar verdict on. Nevertheless, when the circuit judge weighed the comment in light of the fact that Cupach was aware of Beck's numerous ethical, legal, and regulatory violations (all in his compliance file), and of the reality that anyone who bought Beck's practice would have a difficult time discovering the bad conduct without Beck's cooperation, the comment was damning to Ameriprise's case. Further, Cupach knew that, if Vallandingham did not buy Beck's practice, Ameriprise (and Cupach's region) would inherit Beck's practice by default.[3] Any reasonable factfinder could conclude that Cupach knew Vallandingham was buying a firestorm of problems, that Cupach could have remained silent or said something more informative, but that he instead concealed those problems behind a simple "no, there was nothing Vallandingham needed to know."

Cupach's comment falls into a class of fraud known as the "half-truth." A half-truth is a statement by a defendant that, while perhaps technically accurate, is misleading because it omits some qualifying information that, if known to the plaintiff,

---

[3] Another fact suggesting Ameriprise did not want to inherit Beck's practice is that Ameriprise approved the sale of the practice to Vallandingham within one or two days. However, the record shows it typically took Ameriprise around thirty days to approve the sale of a practice to another advisor.

would have caused him to act differently. The drafters of the *Restatement* define a half-truth misrepresentation this way:

> A representation stating the truth so far as it goes but which the maker knows or believes to be materially misleading because of his failure to state additional or qualifying matter is a fraudulent misrepresentation.

*Restatement (Second) of Torts*, § 529 (1977). The drafters commented that "[a] statement containing a half-truth may be as misleading as a statement wholly false." *Id.*, cmt. a. That comment mirrors one by the United States Supreme Court, which once explained that "a statement of a half-truth is as much a misrepresentation as if the facts stated were untrue." *Equitable Life Ins. Co. of Iowa v. Halsey, Stuart & Co.*, 312 U.S. 410, 426 (1941). Half-truths arise regardless of whether a person has a duty to speak or make a representation. Irrespective of whether one has a duty to speak, once a person chooses to do so they must speak truthfully. A half-truth misrepresentation may occur, not when one is silent, but when one volunteers to speak and provides information to influence another but fails to disclose the whole truth.

> A duty to speak may arise from partial disclosure, the speaker being under a duty to say nothing or to tell the whole truth . . . Although a party may keep absolute silence and violate no rule of equity, yet, if he volunteers to speak and to convey information which may influence the conduct of the other party, he is bound to disclose the whole truth.

*Uptegraft v. Dome Petroleum Corp.*, 764 P.2d 1350, 1353-54 (Okla. 1988).

West Virginia does not appear to have directly addressed the half-truth question. However, case law nationwide supports a cause of action for misrepresentation

based on half-truths, and it has done so for over a century.[4]  Once a person chooses to

speak, they must speak truthfully. Good public policy demands this, because the law does

[4] *See, e.g.*, *Bott v. Holman*, 850 N.W.2d 800, 807 (Neb. Ct. App. 2014) ("A statement that is true but partial or incomplete may be a misrepresentation, because it is misleading when it purports to tell the whole truth and does not. . . . When a party makes a partial or fragmentary statement that is materially misleading because of the party's failure to state additional or qualifying facts, the statement is fraudulent."); *Lock v. Schreppler*, 426 A.2d 856, 862 (Del. Super. Ct. 1981) ("A representation may be fraudulent even if it is true, if the defendant knows that because of facts not stated, the statement is materially misleading. . . . Although there is no general duty to speak, nevertheless, if a person undertakes to speak, he then has a duty to make a full and fair disclosure as to the matters about which he assumes to speak."); *Franchey v. Hannes*, 207 A.2d 268, 271 (Conn. 1965) ("[A]lthough a vendor may, under the circumstances, have no duty to speak, nevertheless, if he does assume to speak, he must make a full and fair disclosure as to the matters about which he assumes to speak. He must then avoid a deliberate nondisclosure."); *Kannavos v. Annino*, 247 N.E.2d 708, 711-12 (Mass. 1969) ("Although there may be no duty imposed upon one party to a transaction to speak for the information of the other . . . if he does speak with reference to a given point of information, voluntarily or at the other's request, he is bound to speak honestly and to divulge all the material facts bearing upon the point that lie within his knowledge. Fragmentary information may be as misleading . . . as active misrepresentation, and half-truths may be as actionable as whole lies . . ."); *Sanfran Co. v. Rees Blow Pipe Mfg. Co.*, 335 P.2d 995, 1002 (Cal. Dist. Ct. App. 1959) (A vendor "is not under a duty to make full disclosure . . . However, it is a universally recognized exception that if he undertakes to do so he is bound not only to tell the truth but he is equally obligated not to suppress or conceal facts within his knowledge which materially qualify those stated. If he speaks at all, he must make a complete and fair disclosure."); *Neuman v. Corn Exch. Nat. Bank & Tr. Co.*, 51 A.2d 759, 764 (Pa. 1947) ("The deliberate nondisclosure of a material fact amounts to culpable misrepresentation no less than does an intentional affirmation of a material falsity, see Restatement, Torts, § 529, comment a."); *Hush v. Reaugh*, 23 F. Supp. 646, 652 (E.D. Ill. 1938) ("[M]ere silence is not always proof of fraud but one little word, sufficient to deceive and misinform the other party, may vitally affect the good faith and validity of the transaction."); *Atwood v. Chapman*, 68 Me. 38, 40 (1877) ("It may also be true that the concealment alleged, by itself alone, might not be a cause of action. The rule of *caveat emptor* applies . . . But this rule does not authorize deception in what is said or unsaid. If a person makes representations as to quality or title he is to speak the truth, or if he is placed or places himself in a position where his silence will convey a false impression, his suppression of the truth will be as much a fraud as a false statement. Hence, whether the withholding of a fact is fraudulent must depend upon the accompanying circumstances."); *Restatement (Second) of Contracts* § 159, cmt. b (1981) ("A statement may be true with respect to the facts stated, but may fail to include qualifying matter

not, and cannot, sanction lies as a way of doing business. The circuit court recognized this and found Ameriprise liable for Cupach's half-truth misrepresentation toward Vallandingham: if Cupach had remained silent, or if Cupach had honestly represented the poor state of Beck's business, Vallandingham would not have bought it. The majority opinion chose not to address any of Ameriprise's arguments challenging the circuit court's misrepresentation rulings.

2. *Non-reliance clauses cannot be boilerplate or vague; they must be specific*

Instead of addressing the substance of the parties' arguments regarding Cupach's half-truth misrepresentation, the majority opinion built its non-reliance principles on two sentences from Ameriprise's briefs. Surprisingly, however, the non-reliance clause in the Consent and Release document is addressed nowhere in the sixty pages of

---

necessary to prevent the implication of an assertion that is false with respect to other facts. For example, a true statement that an event has recently occurred may carry the false implication that the situation has not changed since its occurrence. Such a half-truth may be as misleading as an assertion that is wholly false."); 37 Am. Jur. 2d *Fraud and Deceit* § 192 (2025) ("In general, once a person undertakes to speak, that person assumes a duty to tell the whole truth and to make a full and fair disclosure as to the matters about which the person assumes to speak. There is a duty to provide accurate information once one undertakes to speak. Under the law of fraudulent concealment or suppression, a duty to disclose may exist where one voluntarily undertakes to speak but fails to prevent their words from being misleading or conveys only partial information."); 26 Williston on Contracts § 69:17 (4th ed. 2025) ("When one voluntarily discloses information, he has a duty to disclose the whole truth rather than making a partial disclosure that conveys a false impression. Transactional circumstances other than a confidential or fiduciary relationship can give rise to a duty to disclose, and one such circumstance is the disclosure of certain facts which, absent other disclosures, will mislead." (cleaned up)).

Ameriprise's briefs. Nor did Ameriprise cite to a single case discussing those types of

clauses. Rather, the two sentences discuss what Ameriprise calls a "buyer beware" clause.

In these sentences, Ameriprise argues that plaintiff Vallandingham knew he was buying

Beck's practice "as is," and therefore he could not rightfully pursue a fraudulent

concealment claim against Ameriprise.[5]

The majority opinion recognizes that exculpatory contract language, such as

an "integration or merger clause which seeks to limit one party's liability to the other[,]"

is unenforceable to extinguish a fraud claim. *Traders Bank v. Dils*, 226 W. Va. 691, 696,

704 S.E.2d 691, 696 (2010). An "as is" clause is also unenforceable. *Stemple v. Dobson*,

184 W. Va. 317, 322, 400 S.E.2d 561, 566 (1990). In Syllabus Point 3 of *Iafolla v. Douglas*

*Pocahontas Coal Corp.*, 162 W. Va. 489, 250 S.E.2d 128 (1978), the SCAWV said that in

---

[5] The two relevant sentences in Ameriprise's petition for appeal argued:

> *Finally*, Vallandingham executed two documents precluding him
> from claiming the transaction was precipitated by fraudulent concealment:
> (1) the buy/sell agreement in which he affirmed (a) he was "purchasing
> [Beck's] Business and Assets 'as is'" and (b) he "has not relied upon any
> representation or action by Ameriprise in deciding to enter into the
> Succession Agreement" and (2) the Consent and Release in which he
> "hereby releases all rights or claims, known or unknown, he/she may have
> now to any relief of any kind from Ameriprise . . . related to or arising from
> the negotiation of . . . the Transition Agreement." Although an "as is" clause
> does not automatically relieve one from a claim of fraudulent concealment,
> where a party entered [an] "as is" transaction without a special relationship,
> they may not later claim it.

*Brief of the Petitioner* at 31-32.

10

the presence of "fraud, mistake, or material misrepresentations," extrinsic or parol evidence may be admissible in a contract action. Extrinsic evidence of fraud does not contradict or vary terms of a written contract; it shows there was no meeting of the minds and no binding contract was ever made. Stated succinctly, in the past, West Virginia's courts, as well as the courts of other states, have ruled that "[a] party to a contract with another cannot claim shelter by a contractual device, such as an exculpatory or merger provision, against claims of deceit." *Greenleaf Arms Realty Tr. I, LLC v. New Bos. Fund, Inc.*, 962 N.E.2d 221, 228 (Mass. App. Ct. 2012). *See also Restatement (Second) of Contracts*, § 196 (1981) ("A term unreasonably exempting a party from the legal consequences of a misrepresentation is unenforceable on grounds of public policy."). Until today's ruling, that is.

The heart of any fraud or misrepresentation case is a measure of reliance. The essential elements of any fraud case are (1) that the defendant committed (or induced another to commit) a deceitful act or statement, (2) that was material and false, and (3) as a result, the plaintiff was damaged because he justifiably relied on the act or statement.[6] Here, the majority opinion creates a new doctrine whereby a defendant may eviscerate the

---

[6] Syllabus Point 1 of *Lengyel v. Lint*, 167 W. Va. 272, 280 S.E.2d 66 (1981) (cleaned up) sets out the elements of a fraud action:

> The essential elements in an action for fraud are: (1) that the act claimed to be fraudulent was the act of the defendant or induced by him; (2) that it was material and false; that plaintiff relied upon it and was justified under the circumstances in relying upon it; and (3) that he was damaged because he relied upon it.

11

reliance element. The majority opinion declares that a party to a contract may incorporate standardized exculpatory language that compels another party to release every conceivable claim of fraud before it has arisen, merely by declaring in writing that the other party did not rely on anything the drafter of the contract said or did. The majority opinion also finds that this is the goal of every "no representation," "anti-reliance," "no-reliance," "disclaimer-of-reliance," or "non-reliance" clause stuffed into a contract. It concludes that Ameriprise's boilerplate clause – which broadly declares Vallandingham "has not relied upon any representation or action by Ameriprise" – voids any claim that Vallandingham was fraudulently induced into the Beck transaction because it eviscerates any notion Vallandingham relied on Cupach's half-truth misrepresentation.

In addition, the majority opinion is inconsistent with case law from a majority of other jurisdictions that have taken up the issue. Most courts find that "[a] general non-reliance clause, just as a merger clause, does not prevent one from proceeding on tort theories of negligent misrepresentation and fraud." *Slack v. James*, 614 S.E.2d 636, 641 (S.C. 2005). Courts tend to reject non-reliance clauses that are "in a preprinted form" and are nothing "but a generalized boilerplate exclusion." *Manufacturers Hanover Tr. Co. v. Yanakas*, 7 F.3d 310, 317 (2d Cir. 1993). *See also Whelan v. Abell*, 48 F.3d 1247, 1258 (D.C. Cir. 1995) ("Such a reading would leave swindlers free to extinguish their victims' remedies simply by sticking in a bit of boilerplate."). Instead, to have any effect, a non-reliance clause must have specificity: it must speak directly to the representations made by the parties in forming the contract, such that the clause demonstrates a meeting of the minds

12

regarding what representations are being waived. "The only situation in which the . . . courts have held that a contract provision negatives a claim of fraud is where the provision explicitly states a fact completely antithetical to the claimed misrepresentations." *Clements Auto Co. v. Serv. Bureau Corp*., 444 F.2d 169, 179 (8th Cir. 1971).[7] "[I]n order to be considered sufficiently specific to bar a defense of fraudulent inducement," a non-reliance clause "must contain explicit disclaimers of the particular representations that form the basis of the fraud-in-the-inducement claim." *Manufacturers Hanover*, 7 F.3d at 316.

Some courts permit non-reliance clauses, but only "where the substance of the disclaimer provisions tracks the substance of the alleged misrepresentations." *Grumman Allied Indus., Inc. v. Rohr Indus., Inc.*, 748 F.2d 729, 735 (2d Cir. 1984) (citing *Danann Realty Corp. v. Harris*, 157 N.E.2d 597 (N.Y. 1959)). When a party to a contract is claiming some form of fraud or misrepresentation amounting to fraudulent inducement, courts have weighed at least six factors in deciding whether to enforce a non-reliance clause:

---

[7] Some states find no-reliance clauses have no effect. *See, e.g.*, *Thrifty Rent-A-Car Sys., Inc. v. Brown Flight Rental One Corp.*, 24 F.3d 1190, 1195 (10th Cir. 1994) ("Under the law of Oklahoma, one who is fraudulently induced to execute a written contract by the oral misrepresentation of the opposite party may always show that fact in evidence when he bases his defense on fraud in inducing the making of the contract, and he may do this even though the contract sued on provides that all the agreements or representations between the parties are contained therein." (Cleaned up)); *Snyder v. Lovercheck*, 992 P.2d 1079, 1086 (Wyo. 1999) (Any fraud vitiates a contract, and enforcing a non-reliance clause "would open[] the door to a multitude of frauds and [thwart] the general policy of the law.").

13

(1) Whether the complaining party was advised by counsel;

(2) Whether the terms of the agreement were negotiated and not boilerplate;

(3) Whether the transaction was an arm's-length transaction;

(4) Whether the parties were knowledgeable in business matters;

(5) Whether the language of the clause was clear; and

(6) Whether, if litigation was against a fiduciary, the adversarial relationship of the parties demonstrated an absence of trust between the parties that negated any claim of reasonable reliance.

Although no one factor will be dispositive, these circumstances will be considered by a court determining whether to enforce the plain language of a disclaimer-of-reliance clause in the face of allegations of fraud.

*Barr v. Dyke*, 49 A.3d 1280, 1289-90 (Me. 2012).[8] "The presence of counsel speaks to whether or not the playing field is level. Without counsel, a party may not be operating with a full understanding of the transaction." *Id.* at 1290. "Whether or not the contractual provisions were negotiated or boilerplate is important to consider because it arguably

---

[8] In *Forest Oil Corp. v. McAllen*, 268 S.W.3d 51, 60 (Tex. 2008), the court identified five factors to weigh in assessing whether to enforce a non-reliance clause:

Courts must always examine the contract itself and the totality of the surrounding circumstances when determining if a waiver-of-reliance provision is binding. . . . [Factors to consider include:] (1) the terms of the contract were negotiated, rather than boilerplate, and during negotiations the parties specifically discussed the issue which has become the topic of the subsequent dispute; (2) the complaining party was represented by counsel; (3) the parties dealt with each other in an arm's length transaction; (4) the parties were knowledgeable in business matters; and (5) the release language was clear.

14

reflects a clearer intent of the parties." *Id.* "To be sure, it is well established that a general, boilerplate disclaimer of a party's representations cannot defeat a claim for fraud." *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 785 (2d Cir. 2003)

Applying the *Barr v. Dyke* factors here, it is obvious that the non-reliance clause drafted by Ameriprise is not enforceable. First and foremost, the non-reliance clause was pure boilerplate. None of the terms of Ameriprise's Consent and Release were negotiated. The Consent and Release is a two-page, pre-printed document with blanks for the buying and selling advisors to fill in their names and the sale fee. The Ameriprise logo is imprinted at the top of the first page. Second, Vallandingham did not have a lawyer in the process, while Ameriprise had teams of lawyers at its corporate headquarters drafting the boilerplate non-reliance clause with no input from Vallandingham. Third, Vallandingham's dealings with Ameriprise were not entirely at arm's length; as a franchisee, Vallandingham was charged by Ameriprise with growing his business, and as Beck's experience shows, an advisor's failure to grow his business imperiled the advisor's franchise. Finally, the non-reliance clause must be tailored to the circumstances underlying the agreement. That is, the substance of the non-reliance provision must track the substance of the alleged misrepresentations. The non-reliance clause in this case does not conflict with any specific representations in the parties' negotiations, it is simply a blanket, general release of all misconduct. Courts routinely find that a "mere general recitation" is insufficient to bar a defense of fraudulent inducement, because "the touchstone is specificity. Thus, where specificity has been lacking, dismissal of the fraud claim has been

15

ruled inappropriate." *Manufacturers Hanover*, 7 F.3d at 316. A non-reliance provision is enforceable to preclude a fraud claim only where the written provision explicitly states a fact that is completely antithetical to the alleged misrepresentation. In other words, if the Consent and Release had distinct and specific representations – for instance, the contract could have said "Beck has a record of failing to comply with company and FINRA regulations, and Vallandingham bears the burden of obtaining that record from Beck, if he so chooses" – then that specificity might foreclose Vallandingham's fraud claim and I could agree with the majority opinion.[9] On this record, the majority opinion failed to require specificity in the drafting of non-reliance provisions, and it misapplied the law of those provisions to sanction vague, generalized, boilerplate language.[10]

---

[9] The classic example of a non-reliance clause being enforced because of a specific contractual statement is found in the *Danann Realty* case. The plaintiff bought a building from the defendants. The plaintiff sued claiming the defendants made oral misrepresentations about the rents and expenses of the building. However, the plaintiff's allegations directly conflicted with the parties' sales contract, which said the defendant "has not made and does not make any representations as to the physical condition, rents, leases, expenses, operation or any other matter or thing affecting or related to the aforesaid premises[.]" *Danann Realty Corp. v. Harris*, 157 N.E.2d at 598. *Cf. Stephens v. Sponholz*, 674 N.Y.S.2d 244, 245 (1998) (plaintiff sued defendant for oral fraudulent representations concerning water in the basement of a house; an "as is" clause and a general merger clause in the parties' sale agreement "are not specific disclaimers and do not preclude a cause of action based on fraud in the inducement of the contract.").

[10] The majority opinion also takes the position that the non-reliance clause is not unconscionable or one-sided in defendant Ameriprise's favor. It reaches this conclusion by focusing on a right of first refusal in the Consent and Release, effectively finding that plaintiff Vallandingham gave up his right to a fraud action in exchange for Ameriprise giving up its right to buy Beck's practice. However, here, the right of first refusal is completely illusory. First, Ameriprise notes that Cupach asked Vallandingham what he was paying for Beck's practice; when told, Cupach said "he didn't think it was worth what

16

## 3. *Conclusion*

Nationwide, the rule has long been that "[a] party to a contract who has been guilty of fraud in its inducement cannot absolve himself from the effects of his fraud by any stipulation in the contract, either that no representations have been made, or that any right which might be grounded upon them is waived. Such a stipulation or waiver will be ignored, and parol evidence of misrepresentations will be admitted, for the reason that fraud renders the whole agreement voidable, including the waiver provision." *Ron Greenspan Volkswagen, Inc. v. Ford Motor Land Dev. Corp*., 38 Cal. Rptr. 2d 783 n.7 (Cal. Ct. App. 1995). I "continue to believe that parties to contracts, whether experienced in business or not, should deal with each other honestly, and that a party should not be permitted to engage

---

[Vallandingham] was paying." Ameriprise then repeatedly argues that plaintiff Vallandingham overpaid for Beck's practice at $75,000; if that argument is honestly made, then Ameriprise had no actual interest in exercising its right of first refusal to buy Beck's practice. Second, the right of first refusal was meaningless because Ameriprise did not *need* to buy Beck's practice and had the opportunity to take Beck's practice *for free*. Ameriprise terminated Beck's franchise; if he did not sell his practice within 90 days, Ameriprise would assume control and he would receive nothing. If Ameriprise wanted Beck's practice (and all the problems therein), it did not need the right of first refusal because it could have simply refused to allow *anyone* to buy Beck's practice. Put succinctly, the right of first refusal was a "right" on paper that Ameriprise never intended to exercise, and it never intended to put its money on the line. Amerprise's right of first refusal is meaningless.

Nonetheless, what really troubles me is this: Ameriprise never asserted the right of first refusal *in its briefs to this Court.* True, the right is mentioned in various documents. But Ameriprise never argued the right of first refusal clause was worth spit; it's the majority opinion that makes its own factual finding that the right of first refusal has value, and then it uses that value to find that the Consent and Release was "not one-sided in favor of Ameriprise" and that "this exchange was eminently reasonable," despite Ameriprise never believing the right of first refusal had value.

17

in fraud to induce the contract." *McEvoy Travel Bureau, Inc. v. Norton Co.*, 563 N.E.2d 188, 194 (Mass. 1990). The majority wrongfully dispenses with this maxim. Accordingly, I respectfully dissent to the majority opinion.